**LEVI & KORSINSKY LLP**
Adam C. McCall (SBN 302130)
445 South Figueroa St., 31st Floor
Los Angeles, CA 90071
Tel: 213/985-7290
Fax: 202/333-2121
Email: amccall@zlk.com

*Attorneys for Plaintiff M & M Hart Living Trust and Proposed Co-Lead Counsel for the Class*

[*additional counsel on signature page*]

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| M & M HART LIVING TRUST, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>GLOBAL EAGLE ENTERTAINMENT INC., DAVID M. DAVIS, THOMAS E. SEVERSON JR., and MICHAEL ZEMETRA,<br><br>Defendants. | Case No. 2:17-CV-01479-PA-MRW<br><br>**<u>CLASS ACTION</u>**<br><br>**AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL**<br><br>Judge: Hon. Percy Anderson |

Plaintiff M & M Hart Living Trust ("Plaintiff"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, alleges in this Amended Complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to their own acts, and upon facts obtained through an investigation conducted by his counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by Global Eagle Entertainment, Inc. ("Global Eagle" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Global Eagle's public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons or entities, other than Defendants, Global Eagle's directors and officers, and their families and affiliates, who purchased or otherwise acquired Global Eagle common stock between July 27, 2016, and March 16, 2017, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class").

2. Global Eagle provides content, connectivity, and digital media solutions for travel industry worldwide. The Company operates through two segments, Connectivity and Content. The Connectivity segment offers Wi-Fi Internet connectivity through Kuband satellite transmissions. This segment offers specialized network equipment, media applications, and premium content services

that allow airline passengers to access in- flight Internet, live television, on-demand content, texting services, shopping, and flight and destination information, as well as real-time data and operations solutions. The Connect segment selects, manages, and distributes wholly-owned and licensed media content, video and music programming, applications, digital advertising solutions, and video games to airline, maritime, and other away-from-home non-theatrical markets.

3. Global Eagle uses Adjusted EBITDA for earning performance-based incentives. Specifically, executives received Annual Cash Incentive Compensation based on 45% achievement of pre-bonus Adjusted EBITDA. Adjusted EBITDA eliminates acquisition, integration and transaction costs, from its calculation. Accordingly, Defendants in an attempt to increase their cash bonus, acquired Emerging Markets Communications ("EMC") on July 27, 2016 even though it admittedly did not have the personnel to handle an acquisition of that size. By doing so, Defendants were able to raise their Adjusted EBITDA forecast and line their pockets to the detriment of investors.

4. Throughout the Class Period, Defendants misled investors about the success of the acquisition, telling investors that the integration was "going well" and that synergies would be soon be seen. However, Defendants failed to inform investors that their internal controls were in shambles and that Global Eagle was never capable of successfully acquiring a company the size of EMC.

5. In reality, the Company revealed that due to the acquisition of EMC, the Company would be late in filing its Annual Report for 2016 and the Company's disclosure controls and procedures and internal control over financial reporting were not effective as of December 31, 2016 due to: (i) material weaknesses that the Company previously reported but has not yet fully remedied;

and (ii) additional material weaknesses in internal control over financial reporting in the areas of revenues, license-fee expenses, inventory, internally developed software, goodwill impairment and accounting for business combinations, as well as at the entity level affecting two COSO components relating to control environment and risk assessment.

6. Over the course of the Class Period, the truth about Global Eagle's internal controls and inability to handle an acquisition the size of EMC were slowly leaked to the market. As a result, Global Eagle's common stock dropped approximately 56.57%, from $8.06 per share at open on July 27, 2016, to $3.50 per share at close on March 17, 2017, a drop of $4.56 per share.

7. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

8. The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

9. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

10. Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as Global Eagle is headquartered in this District and a significant portion of its business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District.

11. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United

States mail, interstate telephone communications and the facilities of the national securities exchange,

## PARTIES

12. Plaintiff M & M Hart Living Trust ("M & M Hart") purchased Global Eagle common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. M & M Hart filed its certification evidencing its transactions previously with the Court in connection with the initial complaint (Dkt. No. 1). M & M Hart's certification is incorporated herein by reference.

13. Global Eagle is a Delaware corporation with its principal executive offices located at 4553 Glencoe Avenue, Los Angeles, California 90292. During the Class Period, the Company's common stock traded on the NASDAQ Stock Market (the "NASDAQ") under the symbol "ENT."

14. Defendant David M. Davis ("Davis") served as the Company's Chief Executive Officer ("CEO") and Director from July 2014 until his resignation effective February 20, 2017.

15. Defendant Thomas E. Severson, Jr. ("Severson") served as the Company's Chief Financial Officer ("CFO") from August 2016 until his resignation effective February 20, 2017.

16. Defendant Michael Zemetra ("Zemetra") served as the Company's CFO from November 2014 until his resignation in August 2016.

17. Defendants Davis, Severson, and Zemetra are sometimes referred to herein as the "Individual Defendants." Global Eagle together with the Individual Defendants are referred to herein as the "Defendants."

18. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Global Eagle's reports to the SEC, press releases, and presentations to securities analysts,

money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

19. Global Eagle is liable for the acts of the Individual Defendants, and its employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful act complained of herein were carried out within the scope of their employment with authorization.

20. The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to Global Eagle under *respondeat superior* and agency principles.

## SUBSTANTIVE ALLEGATIONS

### A. Company Background

21. Global Eagle provides a wide range of in-flight, maritime and land-based connectivity solutions, including Wi-Fi, movies, television, music and interactive software, as well as portable entertainment solutions, content management services, e-commerce solutions and original content development. The Company's business is comprised of two reporting segments: Connectivity and Content.

22. On July 27, 2016, Global Eagle completed the acquisition of Emerging Markets Communications ("EMC"). EMC is a communications services provider that offers land-based sites and marine vessels globally a multimedia platform delivering communications, Internet, live television, on-demand video, voice, cellular and 3G/LTE services. EMC claims to leverage its satellite-terrestrial-cellular broadband network with fully meshed Multiprotocol Label Switching ("MPLS") interconnected teleports. EMC has a portfolio of patented technologies. EMC's maritime and land businesses comprise a separate service line within the Connectivity reporting segment.

23. The total consideration paid to the member unit holders of EMC for 100% of their membership interests, had a value of approximately $166.5 million and consisted of (i) $45.5 million in cash paid at closing, (ii) the issuance of approximately 5.5 million newly issued shares of Company common stock at closing, (iii) the redemption for cash of approximately $55.1 million of existing seller preferred stock, and (iv) deferred consideration of $25 million to be paid in cash or newly issued shares of the Company's common stock (at the Company's option) one year after the Acquisition Date. The Company also effectively settled a pre-existing relationship with a subsidiary of EMC resulting in additional consideration of $0.2 million. Further, in connection with the acquisition, the Company assumed approximately $370.8 million of EMC indebtedness, which represents the fair value of the debt on the EMC Acquisition Date.

24. Although Global Eagle was in no position to effectively acquire EMC because of its admitted lack of controls and necessary accounting and other executive personnel, doing so would vastly increase the executive's cash bonuses as a result of the increase in Adjusted EBITDA.

25. Knowing that they were unable to acquire EMC without dire results to Global Eagle's internal controls after the acquisition, Defendants went forward

with the acquisition and continually ensured investors that the integration was "going well" and withholding information about the lack of internal controls.

**B. The Company's Internal Controls Over Financial Reporting**

26. As a public company, SEC rules require Global Eagle to maintain internal control over financial reporting to provide reasonable assurance regarding the reliability of financial reporting and preparation of published financial statements in accordance with generally accepted accounting principles, or GAAP, in the United States. Accordingly, Global Eagle was required to document and test its internal controls and procedures to assess the effectiveness of its internal control over financial reporting. Pursuant to the Sarbanes-Oxley Act of 2002, the Company's executive management, including Davis, Zemetra, and Severson, were required to certify that the Company was complying with the law. Contrary to what was actually occurring within the Company, Davis, Zemetra, and Severson certified that they had implemented and maintained adequate internal controls.

**C. Global Eagle Uses Adjusted EBITDA for Cash Bonuses**

27. To supplement Global Eagle's consolidated financial statements, Global Eagle provides investors with Adjusted EBITDA, a non-GAAP financial measure, as a measure of its performance. Adjusted EBITDA is one of the primary measures used by Global Eagle's management and board of directors to understand and evaluate the financial performance and operating trends, including period to period comparisons, to prepare and approve its annual budget and to develop short and long term operational plans. Additionally, **Adjusted EBITDA is one of the primary measures used by the compensation committee of the board of directors to establish the funding targets for the annual bonus pool for the employees and executives.**

28. Global Eagle defines Adjusted EBITDA as net income (loss) before income tax expense (benefit), interest income (expense), change in fair value of financial instruments, other (income) expense, depreciation and amortization, (including depreciation and amortization expense relating to equity method investments), as further adjusted to eliminate the impact of, when applicable, stock-based compensation, **acquisition, integration and transaction costs**, and restructuring charges. Other income (expense), **acquisition, integration and transaction costs** and restructuring charges include such items, when applicable, as (a) income (loss) from investments, foreign currency exchange gains (losses), loss on disposal of fixed assets and other income (expenses), (b) non-cash GAAP purchase accounting adjustments for certain deferred revenue and costs, (c) legal, accounting and other professional fees directly attributable to acquisition activity, (d) employee severance and retention payments and third party professional fees **directly attributable to acquisition** or corporate realignment activities, (e) legal settlements (and related professional fees) or reserves for legal settlements in the period that pertain to historical matters that existed at acquired companies prior to their purchase date, and (f) restructuring expenses and employee termination benefits.

29. Defendants acquired EMC even though they lacked the personnel and internal controls to do so successfully. Consequently, Defendants were able to inflate Adjusted EBITDA and their cash bonuses by backing out acquisition, integration and transaction costs in an attempt to reap the short term benefits.

## D. Global Eagle Has a History of Material Weaknesses of Internal Controls as a Result of Acquisitions

30. A material weakness is defined as "a deficiency, or a combination of deficiencies in internal control over financial reporting, such that there is a

reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis."

31. Global Eagle indicated in the Company's Annual Report filed with the SEC on March 17, 2015, that "[d]uring 2014, [Global Eagle] did not implement and maintain effective [information technology general controls] across certain subsidiaries we acquired in 2013." As a result, there was a material weakness in the Company's internal controls.

32. Further, Global Eagle indicated on its Form 10-K filed with the SEC on March 17, 2016, that Global Eagle had material weaknesses in its internal control over the timeliness of financial **reporting relating to the lack of a sufficient number of personnel to execute a timely financial close and properly accumulate certain analysis and reconciliations consistently in a timely and accurate manner**.

33. Additionally, as indicated in the Form 10-Q filed on November 9, 2016, as of December 31, 2015, Global Eagle's assessment of internal control over financial reporting did not include the internal control over Western Outdoor Interactive Private Limited ("WOI"), which had been acquired during 2015. During the first half of 2016, Global Eagle did not sufficiently focus on assessing the risks of material misstatement and implementing effective transaction level controls at WOI for purposes of the assessment of internal control over financial reporting as of December 31, 2016.

34. Given the history of inadequate internal controls and the admission by the Company that it lacked a sufficient number of personnel, Defendants knew they were issuing false and misleading statements about the EMC acquisition.

**E. Defendants' Materially False and Misleading Statements And Omissions**

*July 27, 2016 Press Release*

35. On July 27, 2016, the Company issued a press release, also attached as Exhibit 99.1 to the Form 8-K filed with the SEC ("July 27, 2016 Form 8-K"), announcing that Global Eagle had completed its previously announced acquisition of EMC. The July 27, 2016 Form 8-K stated the following with regards to the Company's completed acquisition of EMC:

> The combination of GEE and EMC creates one of the world's largest providers of satellite-based connectivity and media to the rapidly growing global mobility market. GEE has established a strong track record of successfully delivering media content and connectivity to airlines, while EMC has become a top provider of connectivity to maritime and hard-to-reach land markets. When combined with EMC, GEE benefits from significant economies of scale and an enhanced global infrastructure that enables it to deliver a comprehensive portfolio of products to customers.
>
> With the combination, GEE possesses unique attributes that will provide additional opportunities to drive revenue growth and operational efficiencies, including:
>
> - An unparalleled portfolio of products and services tailored to mobility markets, including global connectivity, media content in 47 languages, live television, travel and entertainment apps, user interface platforms and data capture and operations analytics tools;
> - A global sales force and support organization that reaches all major mobility verticals including aviation, maritime, energy and remote locations;
> - A satellite and ground-based network infrastructure that can provide customers connectivity and media across multiple frequency bands anywhere in the world;
> - Proprietary, patented technologies that enhance the connected traveler's user experience and reduce costs across market verticals;
> - A diversified revenue base with over 400 customers, balanced between media and connectivity, and over half of all revenue coming from international markets; and

> - Engineering, technical and managerial resources to effectively drive new product development, program management, product maintenance, and field support.
>
> ***Synergy Opportunities***
>
> GEE has a successful track record of integrating acquisitions and achieving synergies. **With EMC, the Company expects to realize synergies of $15 million in 2017, growing to $40 million in 2018 and thereafter.** A major source of savings is expected to come from network efficiencies, including the ability to optimize bandwidth costs through a consolidation of existing network assets, including space segment and ground infrastructure, as well as better capacity utilization. **Savings are also expected through reductions in SG&A spending and the consolidation of facilities**.
>
> In addition to cost savings, GEE expects the combination to generate significant revenue synergies. Driving sales of GEE's media, software, advertising and operations solutions products in the underserved maritime market are a key objective of the Company. GEE's digital media team has had a long-term relationship with EMC and expects to launch new products to major cruise lines before year-end. EMC's proprietary technologies are in use today to improve the connectivity experience and optimize bandwidth usage in the maritime market. GEE will soon introduce these technologies into the aviation market.

July 27, 2016 Form 8-K.

36. The above statements in bold are materially misleading because despite Global Eagle's statements, Global Eagle lacked the internal controls and personnel to issue any type of estimates or guidance related to its acquisition of EMC. In reality, as later disclosed by Global Eagle, Global Eagle had no idea how the EMC acquisition would affect Global Eagle but they made the statements anyway. Further, Global Eagle failed to adequately inform investors of the already

dire state of internal controls and the additional stress that an acquisition the size of EMC would have on the Company.

37. The truth about Global Eagle's internal controls over financial reporting is material because investors would have certainly considered it when deciding whether to invest in the Company. Further, the misleading statements were material because investors considered them in connection with their decisions to purchase and/or sell Global Eagle stock.

*August 8, 2016 Press Release*

38. On August 8, 2016, Global Eagle issued a press release and filed a Form 8-K with the SEC announcing the second fiscal quarter 2016 results for the quarter ended June 30, 2016 ("August 8, 2016 Form 8-K"). The August 8, 2016 Form 8-K touted the success and the progress the Company was having with the EMC acquisition, stating in relevant part:

> With the closing of the EMC acquisition, GEE has expanded its addressable market to include satellite-based connectivity and media solutions to the maritime and hard-to-reach land markets. GEE's revenue base will now be split approximately equally between media content and connectivity sales and it will operate three service lines: Media & Content, Aviation, and Maritime & Land. Media & Content are part of GEE's Content operating segment, and Aviation and Maritime & Land are part of GEE's Connectivity operating segment.
>
> "The acquisition of EMC positions GEE as a leader in supplying satellite based connectivity and media to the rapidly growing global mobility market," continued [CEO Dave] Davis. "**The integration process is well underway as we work towards our goal of $40 million in annual cost synergies in 2018 and thereafter**. Further, we've already launched our products into new verticals, such as the installation of GEE's Airtime digital media and Wi-Fi portal onboard an EMC cruise line customer."

39. The above statements were materially misleading because Global Eagle was in no position to give guidance or estimates of savings from the EMC acquisition. Further, contrary to Defendants' statements, the integration of EMC was not well underway. In reality, Global Eagle could not handle an acquisition the size of EMC and as a result, the acquisition worsened the Company's already materially weak internal controls. Instead of telling investors the truth, that Global Eagle could not handle an acquisition the size of EMC, the dire state of its internal controls, and that it was not capable of giving reliable estimates or guidance, Global Eagle assured investors that the integration process was well underway.

40. The truth about Global Eagle's internal controls over financial reporting is material because investors would have certainly considered it when deciding whether to invest in the Company. Further, the misleading statements were material because investors considered them in connection with their decisions to purchase and/or sell Global Eagle stock.

*August 8, 2016 Earnings Call*

41. On August 8, 2016, after trading hours, Global Eagle had an earnings call to discuss the second quarter results and the acquisition of EMC ("August Earnings Call"). Dave Davis and Michael Zemetra stated in pertinent part:

> **[Dave Davis]**
>
> As a combined company, GEE's revenue base is now better diversified and split equally between media content and connectivity sale. The integration process is well underway, and we expect to realize significant cost savings from this acquisition. **We are on track for $15 million in savings in 2017, growing to at least $40 million in 2018 and thereafter.** Over the past three years, GEE has demonstrated a track record of successfully integrating nine acquisitions, and we expect it to continue with EMC.
>
> **[Michael Zemetra]**

> Turning to guidance. **Including the impact of the EMC acquisition on our last five months of 2016, we are updating our full-year 2016 guidance as follows. 2016 full-year revenue of $545 million to $575 million, 2016 full-year adjusted EBITDA got $80 million to $92 million.** 2016 full-year CapEx range from 40 million to 45 million, which included expected growth investment in connectivity equipment.

August Earnings Call.

42. Further in response to an Analysts' questions, Davis stated the following:

> Yes, so our equipment revenue now is a combination of a connectivity equipment as well as our Nav arrow inflight or electronic fly bay equipment. In terms of guidance, that to that business had traditionally been skewed a bit towards the back two quarters of the year. We gave guidance for the combined company, **if we hadn't have had EMC in the number, just to be clear, we simply would have reiterated our prior guidance for the year. So, we see ourselves on track.**
>
> * * *
>
> **Matt Blazei [Lake Street Capital Markets]**
>
> All right, guys. A question for you. Your guidance for the year is 5.5 to 5.79. I think a $35 million spread. That's a big number in the next five months. Can you give me the variables that might be playing into that?
>
> **Dave Davis**
>
> We just acquired the EMC business. **We're fairly confident in the numbers, we wanted to keep the range broad until we had a little bit more time under your belt with EMC.** The range is essentially as broad as it spends **[sic]** since we started forecasting for the year. With third quarter results, we will tighten up the range.

August Earnings Call.

43. The Company also issued slides to go along with the earnings call ("August Slides"). The slides promote the integration and synergy realization of the EMC acquisition as "savings through reductions in SG&A," and Revenue synergies through driving more content to the maritime industry. August Slides, p. 12.

44. The above statements were materially misleading because Global Eagle was in no position to give guidance or estimates relating to the EMC acquisition. In reality, Global Eagle's internal controls were so bad that Global Eagle did not have the capability to issue guidance or estimates but did so anyway. Further, contrary to Defendants' statements, the integration of EMC was not "on track." Global Eagle could not handle an acquisition the size of EMC and as a result, the acquisition worsened the Company's already materially weak internal controls. Instead of telling investors the truth, that Global Eagle could not handle an acquisition the size of EMC, the dire state of its internal controls, and that it was not capable of giving estimates or guidance, Global Eagle mislead investors about the state of the Company.

45. The truth about Global Eagle's internal controls over financial reporting is material because investors would have certainly considered it when deciding whether to invest in the Company. Further, the misleading statements were material because investors considered them in connection with their decisions to purchase and/or sell Global Eagle stock.

*August 9, 2016 Form 10-Q*

46. On August 9, 2016, Global Eagle filed a Form 10-Q with the SEC announcing the second fiscal quarter 2016 results for the quarter ended June 30, 2016 ("August Form 10-Q"). The August 8, 2016 Form 8-K touted the success and

the progress the Company was having with the Emerging Marketing acquisition, stating in relevant part:

> **Changes in Internal Control over Financial Reporting**
>
> We are in the process of implementing changes, as more fully described in our 2015 Form 10-K, to the Company's internal control over financial reporting to remediate the material weakness as described in our 2015 Form 10-K. Other than such changes, **there have been no changes in our internal control over financial reporting during the three months ended June 30, 2016, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.**

August Form 10-Q, p. 56

47. In conjunction with the August Form 10-Q, Defendants Davis submitted a certification concerning the Company's internal controls. The certification was submitted in accordance with the Sarbanes-Oxley Act of 2002 and represented as follows:

> I, Dave M. Davis, certify that:
>
> 1. I have reviewed this Quarterly Report on Form 10-Q of Global Eagle Entertainment Inc.
>
> 2. **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statement made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;**
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

**(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and**

5. **The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit**

> **committee of registrant's board of directors (or persons performing the equivalent functions):**
>
> > **(a) All significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and**
> >
> > **(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.**

48. Zemetra also submitted certifications concerning the Company's internal controls in conjunction with the August Form 10-Q. The certification was submitted in accordance with the Sarbanes-Oxley Act of 2002 and represented as follows:

> I, Michael Zemetra, certify that:
>
> 1. I have reviewed this Quarterly Report on Form 10-Q of Global Eagle Entertainment Inc.
>
> 2. **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statement made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;**
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as

defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

> (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>
> (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
>
> (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
>
> **(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and**

5. **The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):**

> **(a) All significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and**
>
> **(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.**

49. The bold-faced statements above were materially false and/or misleading because they omitted significant information concerning the Company's internal financial controls. Specifically, the above statements failed to disclose material information concerning the design and operating effectiveness of three COSO components relating to control activities, monitoring activities and information and communication; and accounting for income taxes, and also that Global Eagle had inadequate internal controls over financial reporting in the areas of revenues, license-fee expenses, inventory, internally developed software, goodwill impairment and accounting for business combinations, as well as at the entity level affecting two COSO components relating to control environment and risk assessment.

50. The truth about Global Eagle's internal controls over financial reporting is material because investors would have certainly considered it when deciding whether to invest in the Company. Further, the misleading statements were material because investors considered them in connection with their decisions to purchase and/or sell Global Eagle stock.

51. The above misstatements were material and artificially inflated Global Eagle's stock price. As a result, investors were misled to purchase Global Eagle stock at artificially inflated prices.

### F. The Truth Slowly Begins To Emerge

*August 24, 2016 Press Release*

52. On August 24, 2016, after the market closed, Global Eagle issued a press release announcing the departure of CFO Michael Zemetra, and the appointment of Tom Severson as Executive Vice President and Chief Financial Officer.

53. This was the first indication to the market that Global Eagle was struggling with the acquisition of EMC and had significant material issues with their internal controls.

54. As a result of this revelation, after hours on August 24, 2016, Global Eagle stock declined from $8.69 at close on August 24, 2016, to $8.04 at close on August 26, 2016, a decline of approximately 7.4% over two trading days.

*November 8, 2016 Press Release*

55. On November 8, 2016, after the market closed, Global Eagle issued a press release, also attached as Exhibit 99.1 to a Form 8-K filed with the SEC ("November 8, 2016 Press Release") announcing the Company's financial and operating results for the third fiscal quarter ended September 30, 2016. The Press Release stated in pertinent part:

> "During the quarter, we closed the acquisition of EMC and began the process of integrating our businesses. Already, our combined company has entered into a new agreement with Intelsat that will greatly increase the capacity of our global network while significantly lowering unit costs. **Further, we've combined the management of our network across all verticals into one group to maximize efficiencies,"** said Dave Davis, CEO of GEE. "Also during the quarter, we launched our Airconnect system on Avianca Brasil less than two months after signing the contract and we commenced service on Jet Airways with our AirTime streaming IFE system."
>
> * * *
>
> **Business Outlook**

"While we have had a few setbacks with the loss of one of the American Airlines contracts and delays in our plans to install three large maritime customers, we are well-positioned to realize healthy revenue and Adjusted EBITDA growth as we enter into 2017. **For our fourth quarter 2016, we are projecting our Adjusted EBITDA to be between $23 million and $27 million."** said Tom Severson, CFO at GEE. **"The integration of the EMC business and our detailed synergy plan is well underway. We have identified at least $40 million in annual run-rate synergies that we plan to have substantially completed by early 2018."**

**2016 Guidance:**

GEE is now updating its full-year 2016 guidance. The new full-year guidance is as follows:

- Full year 2016 Revenue of $530-538 million
- Full year 2016 Adjusted EBITDA$^{+}$ of $61-65 million
- Fourth quarter 2016 Adjusted EBITDA$^{+}$ of $23-27 million
- Full year 2016 capital expenditures in the range of $45-50 million

**GEE has updated its 2016 revenue and Adjusted EBITDA guidance for the following reasons:**

- *2016 Revenue revision factors*: 1) American Airline contract loss in Q3 2016, 2) delays in new win Maritime installations and 3) price churn and related three-year contract renewal for EMC African carrier customer. Total revenue impact is an approximate $17 million loss versus our guidance provided in August of 2016.

- *2016 Adjusted EBITDA revision factors*: 1) Revenue items mentioned above, 2) **slower than originally estimated execution of EMC Acquisition synergies** and 3) $4 million in EMC Acquisition satellite capacity discounts **which were initially expected to be realized post acquisition closing but were instead required to be recorded as an element of purchase accounting and in the day one EMC opening balance sheet.** Total Adjusted EBITDA impact is an approximate $20

> million loss versus our guidance provided in August of 2016.
>
> + *With respect to projected full year 2016 and fourth quarter 2016 Adjusted EBITDA,* ***quantitative reconciliations are not available without unreasonable efforts due to the high variability, complexity and low visibility with respect to taxes, purchase accounting adjustments, acquisition-related charges and legal settlement reserves excluded from Adjusted EBITDA.*** *We expect the variability of these items to have a potentially unpredictable, and potentially significant, impact on our future GAAP financial results. See also "About Non-GAAP Financial Measures" below.*

November 8, 2016 Press Release.

56. The above statements started to reveal to the market that Global Eagle's internal controls could not handle an acquisition the size of EMC. For example, Global Eagle revealed that they mistakenly believed they were entitled to $4 million in EMC discounts at the time of the acquisition closing, but in reality were required to be recorded as an element of purchase accounting on the balance sheet. This partially revealed to investors that the Company did not have adequate control over its accounting. Further, Global Eagle indicated that synergies were "slower than originally estimated," indicating that the acquisition of EMC was not going as smoothly as Global Eagle had been representing. However, despite these revelations, Global Eagle continued to mislead investors about the integration of EMC and the true state of internal controls.

57. The statements above relating to the EMC integration and forecasts continued to materially mislead investors. As was later revealed, Global Eagle did not have adequate internal controls to handle an acquisition the size of EMC. Thus, the above statements relating to guidance and estimates are misleading because Global Eagle could not reasonably issue forecasts but did so anyway. Further, despite the Global Eagles assurances that the integration of EMC was "well

underway," the reality was that Global Eagle could not integrate EMC because they did not have the adequate internal controls.

*November 8, 2016 Earnings Call*

58. On November 8, 2016 after trading hours, Global Eagle had an earnings call to discuss the third quarter results and the acquisition of EMC ("November Earnings Call"). Dave Davis and Tom Severson stated in pertinent part:

> **[Davis]**
>
> Let me move on now to our integration with EMC. As you know we closed the EMC transaction during the third quarter and we are moving forward with the integration of our companies. **So far the integration is going well and it has provided GE with a number of significant, strategic and financial benefits.** Through EMC proprietary technologies coupled with our combined scale network coverage and network operations we've been able to strengthen our offerings to our customers. Our recent activation with Avianca Brasil and multiple-maritime content and digital media wins are related to our acquisition with EMC.
>
> While we now believe **our original synergy estimates may prove to be conservative. We are slightly behind in terms of timing and recognizing the benefits in 2016.** Our new synergy estimates are forecast above plan to do better network efficiencies and increased labor and non-labor savings.
>
> We've already consolidated network ops, network products finance and HR functions under one organization. We've also already signed an agreement with Intelsat to receive C- and Ku- band services on eight satellites resulting in significant cost savings on a per megahertz basis.
>
> **[Severson]**

> Now moving on to guidance, we are revising our full year guidance. Full year 2016 revenues are expected to be in the range of $530 million to $538 million. **Full year 2016 adjusted EBITDA is expected to be in the range of $61 million to $65 million. Fourth quarter 2016 adjusted EBITDA is expected to be between $23 million and $27 million.**
>
> * * *
>
> Our downward revision of 2016 adjusted EBITDA guidance versus our prior guidance relates to a few items as well. First, the items impacting 2016 revenue just described resulted in approximately $10 million of 2016 adjusted EBITDA difference. Secondly, **2016 EMC transaction synergies are not going to be executed as quickly as originally expected during the second half of 2016.**
>
> This said, the management teams with the assistance our consulting firm, [indiscernible] have identified at least $40 million of annual run rate synergies which respect to be fully implemented by early 2018. Finally**, the EBITDA guidance is also being negatively impacted by approximately $4 million in EMC related satellite capacity discounts which were initially expected to be realized post closing but we instead required to be reported as an element of purchase accounting and are included in the EMC opening balance sheet.**
>
> So in summary, **the third quarter was challenging as we begin the integration of a very significant acquisition for Global Eagle**. With the management teams working together for a few months now, we feel well position to realize healthy revenue and EBITDA growth of 2017 and now have a clear path to thoughtfully execute transaction synergies as we realized a many other benefits from this combination.

November Earnings Call.

59. The above statements started to reveal to the market that Global Eagle's internal controls could not handle an acquisition the size of EMC. For example, Global Eagle revealed that they were "slightly behind in terms of timing and recognizing" the synergies. This partially revealed that the acquisition of EMC was not going as smoothly as Global Eagle had been representing. For example,

Global Eagle revealed that they mistakenly believed they were entitled to $4 million in EMC discounts at the time of the acquisition closing, but in reality were required to be recorded as an element of purchase accounting on the balance sheet. This partially revealed to investors that the Company did not have adequate control over its accounting. Further, Global Eagle indicated that synergies were "not going to be executed as quickly as originally expected." However, despite these revelations, Global Eagle continued to mislead investors about the integration of EMC and the true state of internal controls.

60. The statements above relating to the EMC integration and forecasts continued to materially mislead investors. As was later revealed, Global Eagle did not have adequate internal controls to handle an acquisition the size of EMC. Thus, the above statements relating to guidance and estimates are misleading because Global Eagle could not reasonably issue forecasts but did so anyway. Further, despite the Global Eagles assurances that the integration of EMC was "going well," the reality was that Global Eagle could not integrate EMC because they did not have the adequate internal controls.

61. As a result of the revelations after hours on November 8, 2016, Global Eagle stock declined from $8.15 at open on November 9, 2016, to $7.17 at close on November 9, 2016, a decline of approximately 12%.

*<u>November 9, 2016 Form 10-Q</u>*

62. On November 9, 2016, Global Eagle filed a Form 10-Q with the SEC announcing the third fiscal quarter 2016 results for the quarter ended September 30, 2016 ("November Form 10-Q"). The November Form 10-Q stated in pertinent part:

> The Company re-evaluated its reporting segments as a result of the EMC Acquisition and concluded that the Company's chief operating

> decision maker ("CODM") would continue to manage the Company's operations for purposes of evaluating financial performance and allocating resources under its existing reporting segments, "Connectivity" and "Content", See Note 2 for further discussion on the Company's reporting segments.
>
> * * *
>
> The decision to report under two reporting segments is principally based upon how the Company's CODM manages the Company's operations as two reporting segments for purposes of evaluating financial performance and allocating resources. The CODM reviews revenue, cost of sales expense and contribution profit information separately for the Connectivity and Content segments. Total segment contribution profit provides the CODM, a measure to analyze operating performance of each of the Company's business segments and its enterprise value against historical data and competitors' data, although historical results may not be indicative of future results, as operating performance is highly contingent on many factors, including customer tastes and preferences. All other financial information is reviewed by the CODM on a consolidated basis.

63. The November 9, 2016 Form 10-Q also revealed to investors additional material weaknesses in Global Eagle's internal controls. Tom Severson signed the November 9, 2016 Form 10-Q that stated in pertinent part:

> **Changes in Internal Control over Financial Reporting**
>
> A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of annual or interim financial statements will not be prevented or detected on a timely basis. We identified a material weakness in our internal control over financial reporting as of December 31, 2015 relating to resources and the timeliness of our financial statement close process, as reported in our 2015 Form 10-K. As of December 31, 2015, our assessment of internal control over financial reporting did not include the internal control over Western Outdoor Interactive Private Limited ("WOI"), which had been acquired during 2015. During the first half of 2016, we did not sufficiently focus on assessing the risks of material misstatement and implementing effective transaction level controls at

> WOI for purposes of our assessment of internal control over financial reporting as of December 31, 2016. **Also, during the third quarter of 2016, we consummated a large business combination which occupied significant resources of our personnel who are also responsible for the performance of important controls. Due to our focus on this transaction and the lack of sufficient qualified resources, we failed to execute certain control and monitoring activities timely, and at a sufficient level of precision to address the risk of material misstatement to our financial statements. Also, we did not appropriately test the completeness and accuracy of information used in the performance of these control and monitoring activities.**
>
> As a result, during the third quarter of 2016, we identified **additional material weaknesses** in our control activities, monitoring, and information and communication systems. Specifically, our management determined that we do not have effective internal controls related to (i) the design of controls with the appropriate precision and responsiveness to address risks relating to the accuracy of financial information being reported by WOI, (ii) the design of controls **to validate the completeness and accuracy of underlying data used in the performance of controls over accounting transactions and disclosures**, (iii) **the timely and effective implementation of our controls, including evidence of operating effectiveness** and (iv) effective monitoring of our controls. Additionally, during the quarter ended September 30, 2016, **we identified a material weakness in our internal controls over financial reporting related to our accounting for income taxes.** As disclosed in our prior filings, a material weakness existed in our financial reporting process relating to the lack of a sufficient number of personnel to execute internal controls. Specifically, we do not yet have a sufficient number of personnel in the income tax function resulting in an untimely execution of internal controls, thereby increasing the risk of income tax accounting issues not being identified and addressed on a timely basis.

November 9, 2016 Form 10-Q, p. 67.

64. In conjunction with the November Form 10-Q, Defendants Davis submitted a certification concerning the Company's internal controls. The

certification was submitted in accordance with the Sarbanes-Oxley Act of 2002 and represented as follows:

> I, Dave M. Davis, certify that:
>
> 1. I have reviewed this Quarterly Report on Form 10-Q of Global Eagle Entertainment Inc.
>
> 2. **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statement made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;**
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
> > (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
> >
> > (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the

> preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
>
> (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
>
> **(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and**
>
> 5. **The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):**
>
> **(a) All significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and**
>
> **(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.**

65. Severson also submitted certifications concerning the Company's internal controls in conjunction with the August Form 10-Q. The certification was submitted in accordance with the Sarbanes-Oxley Act of 2002 and represented as follows:

I, Tom Severson, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q of Global Eagle Entertainment Inc.

2. **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statement made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;**

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

**(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and**

5. **The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):**

**(a) All significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and**

**(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.**

66. The bold-faced statements above partially revealed the true state of Global Eagles internal controls. However, the statements were also materially false and/or misleading because they omitted significant information concerning the Company's internal financial controls. Specifically, the above statements failed to disclose material information that Global Eagle had inadequate internal controls over financial reporting in the areas of revenues, license-fee expenses, inventory,

internally developed software, goodwill impairment and accounting for business combinations, as well as at the entity level affecting two COSO components relating to control environment and risk assessment.

67. As a result of the revelations after hours on November 9, 2016, Global Eagle stock declined from $7.24 at open on November 10, 2016, to $6.84 at close on November 14, 2016, a decline of approximately 5.5% over three trading days.

*February 21, 2017 Press Release*

68. Before the market opened on February 21, 2017, Global Eagle issued a press release ("February 21, 2017 Press Release"), attached to a Form 8-K filed with the SEC on the same day, announcing the sudden departure of Defendant Davis as CEO and Defendant Severson as CFO, both resigning effective February 20, 2017. Additionally, the Company also disclosed that it would be late in filing its Form 10-K for the fiscal quarter and year-ended December 31, 2016, as well as disclosing that it had material weaknesses in internal controls over its financial reporting. The February 21, 2017 Press Release stated, in part:

> **Dave Davis resigned as a Board Director and as CEO effective February 20, 2017** to pursue other endeavors. He will continue to support the Company as a consultant during a transition period.
>
> * * *
>
> The Company also announced that **Tom Severson, Executive Vice President & Chief Financial Officer, resigned, effective February 20, 2017.** The Board has initiated a CFO search to consider candidates for the position. In the interim, Mr. Leddy will serve as the Company's principal financial officer.
>
> **10-K Filing Update**

> **Global Eagle expects to file its Annual Report on Form 10-K for the fiscal year ended December 31, 2016 after the March 16, 2017 U.S. Securities and Exchange Commission deadline.** The Company requires additional time to file its Annual Report **given its increased size and complexity after the Emerging Markets Communications acquisition and the effect of that size and complexity on its financial reporting processes**, its need to transition the finance department after the prior CFO's departure and its need to complete additional financial-closing procedures associated with the Company's material weaknesses in internal control over its financial reporting.
>
> * * *
>
> Other than full-year 2016 revenue, **we are not providing any other estimates of our financial performance (including, without limitation, Adjusted EBITDA) for the fourth quarter or full year 2016, and investors should no longer rely upon any previous estimates that we have made.** In addition to the completion of our financial closing procedures and the procedures and audit to be conducted by our auditors, factors that could cause actual results to differ from those described above are set forth below under "Cautionary Note Concerning Forward-Looking Statements." Accordingly, you should not place undue reliance upon our preliminary estimates.

69. On the same day the Company filed a Form 8-K with the SEC reiterating the statements in the Press Release. The February 21, 2017 Form 8-K stated in pertinent part:

> The Company's Board of Directors (the "Board") has appointed Jeffrey A. Leddy to serve as the Company's Chief Executive Officer and as interim principal financial officer effective February 21, 2017. Mr. Leddy replaces David M. Davis, who on February 17, 2017 delivered notice of his resignation as Chief Executive Officer and as a member of our Board effective February 20, 2017. Mr. Leddy also replaces, on an interim basis, Tom Severson (the Company's former Chief Financial Officer), who resigned from the Company on

> February 20, 2017. Messrs. Davis's and Severson's resignations are not due to any disagreement with the Company.

70. The above statements in bold revealed to the market that the prior statements about the Global Eagle's internal controls and Global Eagle's ability to integrate EMC were false because the acquisition of EMC was too much for the Company to handle. The statements also revealed that Global Eagle did not have the internal controls to provide estimates or guidance to the market and that all past estimates should not be relied upon.

71. The departures of both Davis and Severson partially revealed the dire state of Global Eagle's internal controls and ability to cope with the acquisition of EMC. As Wells Fargo noted in an Equity Research Report dated February 21, 2017, "[i]t is unclear to us why these significant changes are being made right now, but we believe this is a negative for the stock. The company has been in the middle of a major transformation with the recent acquisition of EMC and multipart investment from Chinese partner Beijing Shareco. Dave Davis was the architect of the current Global Eagle so his departure is concerning. Also concerning, Severson was only appointed to the CFO position in August."

72. As a result of the revelations, Global Eagle stock declined from $6.22 at close on February 17, 2017, to $4.48 at close on February 21, 2017, a decline of almost 28%.

73. Even though part of the truth was revealed to the market in the February 21, 2017 Press Release, the complete truth had yet to be revealed.

*March 13, 2017 Form 8-K*

74. After the closed on March 13, 2017, Global Eagle filed a Form 8-K with the SEC announcing the resignation of Frank Mullen, Senior Vice President & Chief Accounting Officer of Global Eagle Entertainment Inc. with his last day

of employment expected to be April 14, 2017. The Company also reiterated that it expected to file its Annual Report on Form 10-K for the fiscal year ended December 31, 2016 after the SEC's March 16, 2017 deadline.

75. The departure of yet another senior executive further signaled to the market the dire material weaknesses of Global Eagle's internal control beyond what had previously been stated by the Company.

76. On this news Global Eagle stock dropped from $4.42 at the open of March 14, 2017, to close at $4.19, a change of over 5%. Even with the departure of another senior executive, the complete truth of the true nature of material weaknesses in internal controls was still not revealed.

*March 16, 2017 Form NT-10K*

77. On March 16, 2017, after the market closed, Global Eagle filed a Form NT 10-K ("Form NT 10-K") announcing the Company's inability to file its Annual Report on Form 10-K for the fiscal year ended December 31, 2016 (the "2016 Form 10-K") within the prescribed time period. The Company also disclosed for the first time "additional material weaknesses in internal control." The Form NT 10-K was signed by new CEO Jeffrey Leddy, and stated in pertinent part:

> Global Eagle Entertainment Inc. (the "Company") is unable to file its Annual Report on Form 10-K for the fiscal year ended December 31, 2016 (the "2016 Form 10-K") within the prescribed time period. The Company requires additional time to file the 2016 Form 10-K due to: **the Company's increased size and complexity following its acquisition of Emerging Markets Communications in July 2016, and the effect of that increased size and complexity on its financial reporting processes**; the Company's need to transition its finance function after the recent departures of its Chief Executive Officer and Chief Financial Officer and during the pending departure of its Chief Accounting Officer; and the Company's need to complete additional

financial-closing procedures associated with its material weaknesses in internal control over financial reporting.

The Company previously disclosed in its Annual Report on Form 10-K for the fiscal year ended December 31, 2015 that it had a material weakness in internal control over financial reporting relating to its lack of a sufficient number of personnel to execute a timely financial close and to properly accumulate certain analyses and reconciliations consistently and in a timely and accurate manner. The Company also previously disclosed in its Quarterly Report on Form 10-Q for the quarter ended September 30, 2016 that it had additional material weaknesses in internal control over financial reporting in the areas of: the design and operating effectiveness of three Committee of Sponsoring Organizations of the Treadway Commission ("COSO") components relating to control activities, monitoring activities and information and communication; and accounting for income taxes.

Although the Company has not yet completed its assessment of the effectiveness of its internal control over financial reporting as of December 31, 2016, the Company expects that it will disclose in the 2016 Form 10-K that the Company's disclosure controls and procedures and internal control over financial reporting were not effective as of December 31, 2016 due to: (i) material weaknesses that the Company previously reported but has not yet fully remedied; and (ii) **additional material weaknesses in internal control over financial reporting in the areas of revenues, license-fee expenses, inventory, internally developed software, goodwill impairment and accounting for business combinations, as well as at the entity level affecting two COSO components relating to control environment and risk assessment**. The Company discovered these additional material weaknesses while preparing its financial statements for the fiscal year ended December 31, 2016. The Company is endeavoring to rectify its material weaknesses and to complete all work necessary to file the 2016 Form 10-K as promptly as practicable. Based on its work to date, the Company expects that it will be necessary to implement additional internal controls and procedures and take other remedial actions relating to its material weaknesses before it can finalize and file its 2016 Form 10-K. This process could require substantial time and resources, and the

> Company's ongoing review may identify additional material weaknesses or other issues that it must address prior to finalizing the 2016 Form 10-K.
>
> Although the Company is diligently addressing the issues described above, it does not expect to file the 2016 Form 10-K within the time period specified in Rule 12b-25.

Form NT 10-K.

78. The above bolded statements finally revealed the truth to the market and investors. Specifically, that not only were internal controls inadequate relating to its lack of a sufficient number of personnel and the design and operating effectiveness of three COSO components relating to control activities, monitoring activities and information and communication; and accounting for income taxes, but also that Global Eagle had inadequate internal controls over financial reporting in the areas of revenues, license-fee expenses, inventory, internally developed software, goodwill impairment and accounting for business combinations, as well as at the entity level affecting two COSO components relating to control environment and risk assessment.

79. This revealed to investors the true state of the dire state of internal controls at Global Eagle and despite Global Eagle's assurance of the integration of EMC, the Company completely lacked the ability to handle an acquisition the size of EMC.

80. On this news, Global Eagle stock dropped from a close of $4.09 on March 16, 2017, to $3.50 at close on March 17, 2017, a 14.42% decline.

## G. Post Class Period Statements

*<u>May 11, 2017 Form NT 10-Q</u>*

81. On May 11, 2017, Global Eagle filed a Form NT 10-Q with the SEC ("Form NT 10-Q"), indicating that the Company's Form 10-Q for the quarter

ended March 31, 2017 (Q1 2017 Form 10-Q) could not be filed within the prescribed time period. Global Eagle stated that the reason they could not timely file their Q1 2017 Form 10-Q was because the Q1 2017 Form 10-Q must include information from the still not filed Form NT 10-K. The Form NT 10-Q was signed by new CFO Paul Rainey. The Company stated in pertinent part:

> The Company will file the 2016 Form 10-K and Q1 2017 Form 10-Q as promptly as practicable. However, **the Company must implement additional internal controls and procedures and take other remedial actions relating to its material weaknesses before it can finalize and file these reports.** This process could require substantial time and resources, and the Company may identify material weaknesses in addition to those previously disclosed that it would have to address prior to finalizing these reports.
>
> * * *
>
> The Company expects that the Q1 2017 Form 10-Q will reflect significant changes in its results of operations due to the Company's acquisition of Emerging Markets Communications in July 2016 and the inclusion of that business in the Company's financial performance for the quarter ended March 31, 2017. For the reasons described in Part III above, **the Company cannot make a reasonable estimate of its results of operations for the first quarter of 2017, including its net income (loss) for this period.**

Form NT 10-Q.

82. The above statements in bold reiterated to the market the dire state of the internal controls and that the Company did not have the ability to issue guidance or estimates to the market. Although this information was already disseminated to the market, it emphasizes the magnitude of the internal control problems.

*<u>May 31, 2017 Form 8-K</u>*

83. On May 31, 2017, Global Eagle filed a Form 8-K with the SEC ("May 31, 2017 Form 8-K") after the market had closed. The May 31, 2017 Form 8-K provided investors an update on selected financial information of the Company. The May 31, 2017 Form 8-K was signed by new CEO Paul Rainy and stated in pertinent part:

> The Company expects its fourth quarter 2016 Adjusted EBITDA to be between $13-18 million.
>
> * * *
>
> The updated fourth-quarter 2016 Adjusted EBITDA guidance above is lower than our prior guidance **due in significant part to accounting policy adjustments.** In many cases these policy adjustments negatively affected our Adjusted EBITDA calculation but did not materially affect our cash flows for the period.
>
> * * *
>
> Adjusted EBITDA is one of the primary measures used by our management and board of directors to understand and evaluate our financial performance and operating trends, including period to period comparisons, to prepare and approve our annual budget and to develop short and long term operational plans. Additionally, **Adjusted EBITDA is one of the primary measures used by the compensation committee of our board of directors to establish the funding targets for our annual bonus pool for our employees and executives.** We believe our presentation of Adjusted EBITDA is useful to investors both because it allows for greater transparency with respect to key metrics used by management in its financial and operational decision-making and our management frequently uses it in discussions with investors, commercial bankers, securities analysts and other users of our financial statements.

May 31, 2017 Form 8-K, p. 1-2

84. The above post-class period statements indicated to investors how far off previous guidance and estimates had been. Further, Global Eagle revealed that its previous accounting policy resulted in an inflated Adjusted EBITDA. This

information is material and shows that the lack of internal controls during the Class Period inflated the Company's Adjusted EBITDA resulting in higher annual bonus pools for the employees and executives.

**H. Defendants Acted with Scienter**

85. The materially false and misleading misrepresentations and omissions alleged herein were made by the Defendants with scienter.

*Defendants Benefitted Financially*

86. As indicated above, Defendants attempted to benefit financially as a result of the lack of internal controls. The compensation committee of Global Eagle's board of directors uses Adjusted EBITDA as one of the primary measures to establish the funding targets for the Company's annual bonus pool for its employees and executives.

87. For 2015, the annual incentive payouts for the named executive officers were calculated as follows: 45% on achievement of pre-bonus Adjusted EBITDA targets, 25% on achievement of consolidated revenue targets, 15% on achievement of 2015 strategic objectives agreed to in December 2014 and 15% on achievement of individual objectives identified for each named executive officer, as assessed by the Compensation Committee. Accordingly, the vast majority of the Defendants' Annual Cash Incentive Compensation came directly from Adjusted EBITDA.

88. As indicated in the May 31, 2017 Form 8-K, the updated fourth-quarter 2016 Adjusted EBITDA guidance was lower than Global Eagle's prior guidance **due in significant part to accounting policy adjustments.** By encouraging an environment of inadequate internal controls, the Defendants were able to inflate Adjusted EBITDA and gain financially. It wasn't until after the

departure of the executive Defendants and the true nature of internal controls were revealed that Global Eagle decided to change its accounting policy.

89. Consequently, this is highly indicative of scienter.

*Defendants Knew About the Misrepresentations*

90. Prior to the Class Period, the Company had already experienced on-going material weaknesses in their internal controls directly related to the acquisition of Western Outdoor Interactive Private Limited ("WOI"), which had been acquired during 2015. Global Eagle admitted that during the first half of 2016, they did not sufficiently focus on assessing the risks of material misstatement and implementing effective transaction level controls at WOI for purposes of our assessment of internal control over financial reporting as of December 31, 2016.

91. Further, in the Company's Annual Report filed with the SEC on March 17, 2015, Global Eagle indicated that "[d]uring 2014, [Global Eagle] did not implement and maintain effective ITGCs across certain subsidiaries we acquired in 2013." As a result, there was a material weakness in the Company's internal controls.

92. Global Eagle had a history of encountering problems and material weaknesses in its internal controls from acquiring smaller businesses. Despite this fact, Defendants and Global Eagle represented to investors that the integration of EMC was going well and disseminated information without any reasonable basis that the acquisition of EMC, a much larger company, would be any different.

93. At the time of the first misstatement Defendants had knowledge that acquisitions were the cause of many of their internal weaknesses. Nevertheless, after the acquisition of EMC, Defendants filed guidance and partial disclosures of its internal weaknesses without disclosing the fact that the internal controls of

Global Eagle could not handle an acquisition the size of EMC. Thus, this is highly indicative that Defendants knew the misstatements were false or misleading when they were made.

94. Defendants also repeatedly represented to investors that the Company's internal controls were adequate and that Individual Defendants were complying with their obligations under SOX. Individual Defendants made these representations notwithstanding the fact that the internal controls had been problematic from the very beginning and an acquisition the size of EMC would worsen the internal controls.

95. For example, Defendants represented that they had "Evaluated the effectiveness of the registrant's disclosure controls." Accordingly, Defendants regularly reviewed the internal controls of Global Eagle and knew that they were worsened by the acquisition of EMC.

96. In addition, the core-function of the CEO and CFO's is to monitor and ensure adequate internal controls of the Company. For example, the Company stated that Davis was qualified to serve on its Board of Directors due to his understanding of the Company, and his operating, investment and management experience. Further, Davis was the prior CFO of Global Eagle from January 31, 2013 until July 8, 2014. Davis also owns an MBA from the University of Minnesota.

*__Executives Abrupt Departures from the Company__*

97. The departure of one CEO, two CFOs, and one Senior Vice President & Chief Accounting Officer during the Class Period is also highly indicative of scienter.

98. Defendant Zemetra resigned from Global Eagle on August 22, 2016, just one month after the first misrepresentation. Although the Company indicated

that Zemetra resigned to pursue other opportunities, there is no reference to what those opportunities were. This supports an inference that Zemetra's removal from executive management was neither innocent nor the byproduct of a mutual decision. Rather, it is likely that Zemetra, after disseminating false information to inflate his bonus, had a change of heart and was pushed out. Zemetra was replaced by the EMC CFO, Tom Severson.

99. Davis, Severson, and Mullens' departures just weeks prior to the final corrective disclosure are also indicative of scienter. The timing of the resignations relative to the Company's corrective disclosures on March 16, 2017 creates an inference that their removal was neither innocent nor the byproduct of a mutual decision. Rather, the timing supports an inference that they were pushed out of office due to their materially false and/or misleading statements concerning the Company's internal controls and guidance.

## I. Loss Causation and Economic Loss

100. During the Class Period, as detailed herein, Global Eagle and the Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Global Eagle's common stock and operated as a fraud or deceit on Class Period purchasers of Global Eagle's common stock by materially misleading the investing public. Later, when Global Eagle and Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Global Eagle's common stock materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of Global Eagle's common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

101. Global Eagle's stock price fell in response to partial corrective events, as noted *supra*. The drops, tied to the corrective disclosures were sharp, on high volume, and removed the inflation from Global Eagle's stock.

**J. Presumption of Reliance; Fraud-On-The-Market**

102. At all relevant times, the market for Global Eagle's common stock was an efficient market for the following reasons, among others:

(a) Global Eagle's common stock met the requirements for listing and was listed and actively traded on the NASDAQ during the Class Period, a highly efficient and automated market;

(b) Global Eagle communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c) Global Eagle was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d) Unexpected material news about Global Eagle was reflected in and incorporated into the Company's stock price during the Class Period.

103. As a result of the foregoing, the market for Global Eagle's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in Global Eagle's stock price. Under these circumstances, all purchasers of Global Eagle's common stock during the Class Period suffered similar injury through their purchase of Global

Eagle's common stock at artificially inflated prices, and a presumption of reliance applies.

104. Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

**K. No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine**

105. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint.

106. To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

107. Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Global Eagle who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by the defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not

stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

108. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Global Eagle's common stock during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

109. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Global Eagle's common stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Global Eagle or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of November 4, 2016, the date of the Company's last quarterly or annual report within the Class Period, there were 85,309,744 shares of the Company's common stock outstanding. Upon information and belief, these shares are held by thousands, if

not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

110. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

111. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

112. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Global Eagle;

(c) whether the Individual Defendants caused Global Eagle to issue false and misleading financial statements during the Class Period;

(d) whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e) whether the prices of Global Eagle's common stock during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

(f) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

113. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action

## COUNT I
## Against All Defendants
## for Violations of Section 10(b) and Rule 10b-5 Promulgated Thereunder

114. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

115. This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

116. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Global Eagle common stock; and (iii) cause Plaintiff and other members of the Class to purchase or

otherwise acquire Global Eagle's common stock and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

117. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Global Eagle's common stock. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

118. By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

119. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of Global Eagle's internal affairs.

120. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Global Eagle's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Global Eagle's common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Global Eagle's common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by defendants, and were damaged thereby.

121. During the Class Period, Global Eagle's common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Global Eagle's common stock at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Global Eagle's common stock was substantially lower than the prices paid by Plaintiff

and the other members of the Class. The market price of Global Eagle's common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

122. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

123. As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**Against the Individual Defendants and Global Eagle for Violations of Section 20(a) of the Exchange Act**

124. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

125. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about Global Eagle's misstatements.

126. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by Global Eagle that had become materially false or misleading.

127. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings that Global Eagle disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Global Eagle to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Global Eagle's common stock.

128. Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Global Eagle to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities that comprise the primary violations about which Plaintiff and the other members of the Class complain.

129. By reason of the above conduct, the Individual Defendants and/or Global Eagle are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demand judgment against defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated: June 5, 2017

/s/ Adam C. McCall

**LEVI & KORSINSKY LLP**
Adam C. McCall (SBN 302130)
445 South Figueroa Street, 31st Floor
Los Angeles, CA 90071
Tel: (213) 985-7290
Fax: (202) 333-2121
Email: amccall@zlk.com

**LEVI & KORSINSKY LLP**
Nicholas I. Porritt (DC 457611) (NY 2798460)
Adam M. Apton (DC 1017720) (NY 4759841)
1101 30th Street NW, Suite 115
Washington, DC 20007
Tel: (202) 524-4290
Fax: (202) 333-2121
Email: nporritt@zlk.com
Email: aapton@zlk.com
*pro hac vice to be submitted*

BRONSTEIN, GEWIRTZ
& GROSSMAN
Shimon Yiftach (SBN 277387)
1925 Century Park East, Suite 1990

Los Angeles, CA 90067
Tel: 424/322-0322
Fax: 212/697-7296

***Attorneys for Plaintiff M & M Hart Living Trust and Proposed Co-Lead Counsel for the Class***

**CERTIFICATE OF SERVICE**

I hereby certify that on June 5, 2017, I electronically filed the document(s) with the Clerk of the Court by using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing ("NEF") was automatically generated to the CM/ECF registrants on record. Participants in the case who are not registered CM/ECF users will be served by mail or by other means permitted by the court rules.

Dated: June 5, 2017

s/ Adam C. McCall
Adam C. McCall