UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | CV 17-1479 PA (MRWx) | Date | August 20, 2017 |
| Title | M & M Hart Living Trust v. Global Eagle Entertainment, Inc., et al. | | |

| | |
|---|---|
| Present: The Honorable | PERCY ANDERSON, UNITED STATES DISTRICT JUDGE |

| | | |
|---|---|---|
| Kamilla Sali-Suleyman | Not Reported | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| | |
|---|---|
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| None | None |

**Proceedings:** IN CHAMBERS - COURT ORDER

Before the Court is a Motion to Dismiss Plaintiff's Amended Class Action Complaint filed by defendants Global Eagle Entertainment, Inc. ("Global Eagle"), David M. Davis ("Davis"), Thomas E. Severson, Jr. ("Severson"), and Michael Zemetra[1/] ("Zemetra") (collectively "Defendants"). (Docket No. 37.) Lead plaintiff M & M Hart Living Trust ("Plaintiff") has filed an Opposition (Docket No. 41), to which Defendants have submitted a Reply (Docket No. 46). Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the Court finds that these matters are appropriate for decision without oral argument. The hearing calendared for July 17, 2017, is vacated, and the matter taken off calendar.

## I. BACKGROUND

Global Eagle is a NASDAQ-listed company that provides content, connectivity, and digital media solutions for the travel industry. (FAC ¶ 2.) Each individual defendant was an officer of Global Eagle, with Davis serving as Chief Executive Officer and Director from July 2014 until February 20, 2017, Severson served as Chief Financial Officer from August 2016 until February 20, 2017, and Zemetra served as CFO from November 2014 until August 2016. (Id. ¶¶ 14, 15, 17.)

Prior to 2016, Global Eagle had acquired several companies. (Id. ¶¶ 90–92.) Each acquisition weakened Global Eagle's internal controls, as Global Eagle disclosed. (See id. ¶¶ 31–33, 90–92; Docket No. 38 ("RJN"),[2/] Exs. A, B, C.) On March 17, 2016, Global Eagle filed its 2015 Form 10-K, in which

[1/] Since the filing of this Motion, Plaintiff has voluntarily dismissed Zemetra. (Docket No. 56.)

[2/] Defendants request judicial notice of several Global Eagle's U.S. Securities and Exchange Commission (SEC) filings, press releases, earnings calls, and an investor presentation, all of which are available on the SEC's public website. (See RJN.) In ruling on a motion to dismiss pursuant to Rule 12(b)(6), a court may take judicial notice of matters referred to in the complaint, but not attached, where the document's authenticity is not contested and the complaint necessarily relies on them. Lee v. City of L.A., 250 F.3d 668, 688 (9th Cir. 2001). A court may also judicially notice matters of public record. Id.
(continued...)

it notified investors that it may acquire additional businesses or technologies, and warned investors that such acquisitions could expose Global Eagle to additional risks including "controls in the acquired business." (Id., Ex. C.)

**A. Class Period Statements**

On July 27, 2016, Global Eagle announced the completion of the acquisition of Emerging Markets Communications (EMC). (FAC ¶ 22.) EMC is a communications services provider that offers a multimedia platform delivering communications, internet, live television, on-demand video, etc. to land-based sites and marine vessels. (Id.) In the same press release, Global Eagle issued guidance of synergies and earnings, stating that "'[w]ith EMC, the Company expects to realize synergies of $15 million in 2017, growing to $40 million in 2018 and thereafter.'" (Id. ¶ 35 (quoting July 27, 2016 Form 8-K Press Release)).) Global Eagle further stated that "[s]avings are . . . expected through reductions in SG&A spending and the consolidation of facilities." (Id. ¶ 35 (quoting July 27, 2016 Form 8-K Press Release).)

On August 8, 2016, Global Eagle filed a Form 8-K and press release, asserting that "'[t]he integration process is well underway as we work towards our goal of $40 million in annual cost synergies in 2018 and thereafter.'" (Id. ¶ 38 (quoting August 8, 2016 Form 8-K Press Release (quoting defendant Davis)).) The same day, Davis and Zemetra participated in an earnings call, in which Davis reiterated the projections and stated that Company was "on track" for the 2017–2018 guidance projections. (Id. ¶ 41 (quoting Aug. 8, 2016 Earnings Call) (Davis: "We are on track for $15 million in savings in 2017, growing to at least $40 million in 2018 and thereafter."); (Zemetra: "Including the impact of the EMC acquisition on our last five months of 2016, we are updating our full-year 2016 guidance as follows. 2016 full-year revenue of $545 million to $575 million, 2016 full-year adjusted EBITDA got $80 million to $92 million."); id. ¶ 42 (quoting Aug. 8, 2016 Earnings Call) (Davis: "We gave guidance for the combined company, if [sic] we hadn't have had EMC in the number, just to be clear, we simply would have reiterated our prior guidance for the year. So, we see ourselves on track.").) In response to a question about why the guidance had a $35 million range, Davis explained, "'We're fairly confident in the numbers, we wanted to keep the range broad until we had a little bit more time under your belt with EMC.'" (Id. (quoting Aug. 8, 2016 Earnings Call).)

---

2/(...continued)
at 789. Courts regularly find SEC filings, as well as press releases, earnings calls, and other information made available to the market to be matters of public record, regardless of whether it was referenced in the complaint. See Dreiling v. Am. Express Co., 458 F.3d 942, 946 n.2 (9th Cir. 2006); Heliotrope Gen., Inc. v. Ford Motor Co., 189 F.3d 971, 981 n.18 (9th Cir. 1999); In re Hansen Natural Corp. Sec. Litig., 527 F. Supp. 2d 1142, 1149 (C.D. Cal. 2007). Plaintiff has not objected to the Court taking judicial notice of these documents. The Court grants the requested judicial notice of these documents, but not as to the truth of the matters asserted therein. See In re Wet Seal, Inc., Sec. Litig., 518 F. Supp. 2d 1148 (C.D. Cal. 2007).

The next day, August 9, 2016, Global Eagle issued a Form 10-Q and press release stating that it was implementing changes to remediate material weaknesses caused by Global Eagle's acquisition of Western Outdoor Interactive Private Limited (WOI) in 2015, which were disclosed in the 2015 Form 10-K. (FAC ¶¶ 33, 46 ("'We are in the process of implementing changes, as more fully described in our 2015 Form 10-K, to the Company's internal control over financial reporting to remediate the material weakness as described in our 2015 Form 10-K.'") (quoting Aug. 9, 2016 Form 10-Q).) Global Eagle stated that "[o]ther than such changes, there have been no changes in our internal control over financial reporting during the three months ended June 30, 2016, that have materially affected, or are reasonably likely to materially affect our internal control over financial reporting." (Id. ¶ 46 (quoting Aug. 9, 2016 Form 10-Q).)

In conjunction with the August 9 Form 10-Q, Davis and Zemetra filed certifications required by the Sarbanes-Oxley Act of 2002, 15 U.S.C. § 7241(a)(1)–(4), affirming that "'[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statement made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report.'" (Id. ¶¶ 47 (Davis Aug. 9, 2016 Form 10-Q Sarbanes-Oxley Certification), 48 (Zemetra Aug. 9, 2016 Form 10-Q Sarbanes-Oxley Certification).) In addition, they certified that they

> [d]isclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and . . . have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors . . . (a) All significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.

(Id. ¶¶ 47 (Davis Aug. 9, 2016 Form 10-Q Sarbanes-Oxley Certification), 48 (Zemetra Aug. 9, 2016 Form 10-Q Sarbanes-Oxley Certification).)

The FAC alleges that, thereafter, Defendants began to reveal the "truth" to investors, while continuing to omit material information and make misrepresentations.

After the market closed on August 24, 2016, Global Eagle announced the departure of Zemetra and appointment of Severson as Executive Vice President and CFO. (Id. ¶ 52.) Global Eagle stock

decreased from $8.69 at close on August 24 to $8.04 at close on August 26, a decline of approximately 7.4%. (Id. ¶ 54.)

On November 8, 2016, after the market closed, Global Eagle issued a press release, rendering further synergy and earnings guidance and asserting that integration of EMC was "well underway." (Id. ¶ 55 (quoting Nov. 8, 2016, Press Release) ("'For our fourth quarter 2016, we are projecting our Adjusted EBITDA to be between $23 million and $27 million . . . . The integration of the EMC business and our detailed synergy plan is well underway. We have identified at least $40 million in annual run-rate synergies that we plan to have substantially completed by early 2018.'" (quoting Severson)).) The press release disclosed slower than originally estimated execution of EMC acquisition synergies, and that $4 million in EMC Acquisition satellite capacity discounts were recorded incorrectly. (Id.) These factors impacted Adjusted EBITDA for 2016 in the amount of approximately $20 million, leading to a reduction in the 2016 guidance. (Id.) Global Eagle disclosed that "[w]ith respect to projected full year 2016 and fourth quarter 2016 Adjusted EBITDA, quantitative reconciliations are not available without unreasonable efforts due to the high variability, complexity and low visibility with respect to taxes, purchase accounting adjustments, acquisition-related charges and legal settlement reserves excluded from Adjusted EBITDA." (Id. ¶ 55 (quoting Nov. 8, 2016, Press Release).)

The same day, Davis and Severson participated in an earnings call, in which Severson reiterated that the 2016 EMC transaction synergies were not going to be executed as quickly as planned in the second half of 2016, as well as the negative impact of the misreporting of the satellite discounts. (Id. ¶ 58.) Davis acknowledged that "'[w]hile we now believe our original synergy estimates may prove to be conservative. [sic] We are slightly behind in terms of timing and recognizing the benefits in 2016.'" (Id. (quoting Nov. 8, 2016 Earnings Call).) As Severson explained, "'in summary, the third quarter was challenging as we begin the integration of a very significant acquisition for Global Eagle.'" (Id. (quoting Nov. 8, 2016 Earnings Call).)

Optimistic statements were made in this call as well, with Davis asserting that "'[s]o far the integration is going well and it has provided [Global Eagle] with a number of significant, strategic and financial benefits.'" (Id. (quoting Nov. 8, 2016 Earnings Call).) Severson repeated the earnings guidance issued in the press release. (Id. (quoting Nov. 8, 2016 Earnings Call) (Severson: "Full year 2016 adjusted EBITDA is expected to be in the range of $61 million to $65 million. Fourth quarter 2016 adjusted EBITDA is expected to be between $23 million and $27 million.").) Global Eagle stock decreased from $8.15 at open on November 9, 2016, to $7.17 at close on November 9, 2016, a decline of approximately 12%. (Id. ¶ 61.)

On November 9, 2016, after the market closed, Global Eagle released a Form 10-Q in which it disclosed certain failures in resources, internal controls, and monitoring:

> [D]uring the third quarter of 2016, we consummated a large business combination which occupied significant resources of our personnel who are also responsible for the performance of important controls. Due to our

> focus on this transaction and the lack of sufficient qualified resources, we failed to execute certain control and monitoring activities timely, and at a sufficient level of precision to address the risk of material misstatement to our financial statements. Also, we did not appropriately test the completeness and accuracy of information used in the performance of these control and monitoring activities.
>
> As a result, during the third quarter of 2016, we identified additional material weaknesses in our control activities, monitoring, and information and communication systems. Specifically, our management determined that we do not have effective internal controls related to (i) the design of controls with the appropriate precision and responsiveness to address risks relating to the accuracy of financial information being reported by WOI, (ii) the design of the controls to validate the completeness and accuracy of underlying data used in the performance of controls over accounting transactions and disclosures, (iii) the timely and effective implementation of our controls including evidence of operating effectiveness and (iv) effective monitoring of our controls. Additionally, during the quarter ended September 30, 2016, we identified a material weakness in our internal controls over financial reporting related to our accounting for income taxes. As disclosed in our prior filings, a material weakness existed in our financial reporting process relating to the lack of a sufficient number of personnel to execute internal controls.

(Id. ¶ 63 (quoting Nov. 9, 2016 Form 10-Q).) With this Form 10-Q, Davis and Severson[3/] filed Sarbanes-Oxley certifications, making the same certifications as those contained in the August Form 10-Q Sarbanes-Oxley certifications. (Id. ¶¶ 64, 65; see supra.) Global Eagle stock decreased from $7.24 on November 10, 2016, to $6.84 on November 14, 2016, a decline of 5.5% over three trading days. (Id. ¶ 67.)

Then, in a February 21, 2017 press release, Global Eagle (1) announced the resignations of Davis and Severson; (2) revealed that it needed additional time to file its 2016 Form 10-K because of Global Eagle's increased size and complexity after acquiring EMC, and the effect of that size and complexity on Global Eagle's financial reporting processes; and (3) stated that it would not provide any other estimates of its financial performance for the fourth quarter or full year 2016, and "'investors should no longer rely

---

[3/] While the FAC states that Severson's certification involved the August Form 10-Q, it appears that Plaintiff meant the November 9, 2016 Form 10-Q, given that this allegation immediately follows the discussion of the November 9, 2016 10-Q in the FAC, the FAC's allegations are otherwise chronological, and Severson was not employed by Global Eagle as CFO at the time the August Form 10-Q was filed.

upon any previous estimates that we have made.'" (Id. ¶ 68 (quoting Feb. 21, 2017 Press Release).) Global Eagle's stock decreased from $6.22 at close on February 17 to $4.48 at close on February 21, 2017, a decline of almost 28%. (Id. ¶ 72.)

On March 13, 2017, Global Eagle filed a Form 8-K announcing the resignation of Frank Mullen, its Senior Vice President & Chief Accounting Officer. (Id. ¶ 74.) On March 14, Global Eagle stock decreased from $4.42 to $4.19, a decline of over 5%. (Id. ¶ 76.)

**B. Cautionary Statements**

The Form 10-Qs and each press release contained cautions regarding forward-looking statements, providing, in relevant part, that:

> These forward-looking statements relate to expectations or forecasts for future events, including without limitation our earnings, revenues, expenses or other future financial or business performance or strategies, or the impact of legal or regulatory matters on our business, results of operations or financial condition. These statements may be preceded by, followed by or include the words "may," "might," "will," "will likely result," "should," "estimate," "plan," "project," "forecast," "intend," "expect," "anticipate," "believe," "seek," "continue," "target" or similar expressions.
>
> These forward-looking statements are based on information available to us as of the date of this Quarterly Report on Form 10-Q and on our current expectations, forecasts and assumptions, and involve substantial risks and uncertainties. Actual results may vary materially from those expressed or implied by the forward looking statements herein due to a variety of factors, including: our ability to integrate our acquired businesses, the ability of our business to grow, including through acquisitions which we are able to successfully integrate, and the ability of our executive officers to manage growth profitably; any delay or inability to realize the expected benefits and synergies of the EMC acquisition . . . .

(RJN, Ex. D; see, e.g., id., Exs. I, J, K.) The earnings calls on August 8, 2016, and November 8, 2016, were each opened with similar cautions:

> I would like to remind you that the discussions during the call will include certain forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995 which are based on management's current expectations and beliefs and are subject to uncertainty and changes in circumstances. Actual results may vary

> materially from those expressed or implied by those statements due to various factors which are discussed in Global Eagle's most recent annual report on Form 10-K, and in subsequent reports on forms 10-Q and 8K. Global Eagle is under no obligation to and in fact expressly disclaims any such obligation to update or alter it's [sic] forward-looking statements, whether as a result of new information, future events, or otherwise.

(Id., Ex. L; see, e.g., id., Ex. M.)

### C. Final Disclosure

On March 16, 2017, Global Eagle filed a Form NT 10-K, announcing its inability to file the 2016 Form 10-K within the prescribed time period due to Global Eagle's increased size and complexity following its acquisition of EMC, and the effect of that increased size and complexity on its financial reporting processes. (Id. ¶ 77.) It revealed in its 2016 Form 10-K that:

> disclosure controls and procedures and internal control over financial reporting were not effective as of December 31, 2016 due to: (i) material weaknesses that the Company previously reported but has not yet fully remedied; and (ii) additional material weakness in internal control over financial reporting in the area of revenues, license-fee expenses, inventory, internally developed software, goodwill impairment and accounting for business combinations, as well as at the entity level affecting two COSO components relating to control environment and risk assessment. The Company discovered these additional material weaknesses while preparing its financial statements for the fiscal year ended December 31, 2016.

(Id.) Global Eagle's stock decreased from $4.09 at close on March 16, 2017, to $3.50 at close on March 17, 2017, a decline of 14.42%. (Id. ¶ 80.)

### D. Post-Class Period Disclosures

On May 11, 2017, Global Eagle disclosed that the Form 10-Q for the first quarter of 2017 could not be timely filed, as "'[Global Eagle] must implement additional internal controls and procedures and take other remedial actions relating to its material weaknesses before it can finalize and file these reports . . . . [Global Eagle] cannot make a reasonable estimate of its results of operations for the first quarter of 2017, including its net income (loss) for this period.'" (Id. ¶ 82 (quoting May 11, 2017 Form NT 10-Q).) Furthermore, on May 31, 2017, Global Eagle updated its fourth-quarter 2016 Adjusted EBITDA guidance to $13–$18 million from the $23–$27 million estimated in November 2016, "'due in significant part to accounting policy adjustments.'" (Id. ¶ 83 (quoting May 31, 2017 Form 8-K).) Global Eagle further explained that "'Adjusted EBITDA is one of the primary measures used by the

compensation committee of our board of directors to establish funding targets for our annual bonus pool for our employees and executives.'" (Id. (quoting May 31, 2017 Form 8-K).)

### E. Procedural History

Plaintiff filed its original complaint on February 23, 2017. (Docket No. 1.) Defendants filed a motion to dismiss (Docket No. 24), and, in response, Plaintiff filed the First Amended Complaint on June 5, 2017 (Docket No. 29). The Court granted Plaintiff's Motion for Appointment as Lead Plaintiff and Approval of Lead Counsel on June 26, 2017. (Docket No. 42.) Plaintiff seeks to represent a class of all persons or entities who purchased or otherwise acquired Global Eagle common stock between July 27, 2016, and March 16, 2017, inclusive. (FAC ¶ 1.) Plaintiff asserts that throughout the class period, Defendants conveyed that the EMC acquisition was going well, published synergy and earnings guidance, and made incomplete statements regarding the internal controls of Global Eagle. These statements allegedly contained material misrepresentations or omissions because internal controls were "in shambles" and Global Eagle "was never capable of successfully acquiring a company the size of EMC." (Id. ¶ 4.) Based on these allegations, Plaintiff brings claims against each Defendant for violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder, and for violation of Section 20(a) of the Securities Exchange Act. Defendants move to dismiss the FAC in its entirety.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) allows dismissal of a complaint for "failure to state a claim upon which relief can be granted." In order to survive a Rule 12(b)(6) motion, typically a complaint need only give "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "All allegations of material fact are taken as true and construed in the light most favorable to the plaintiff." In re Stac Elecs. Sec. Litig., 89 F.3d 1399, 1403 (9th Cir. 1996) (quoting In re Wells Fargo Sec. Litig., 12 F.3d 922, 925 (9th Cir. 1993)). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Id. (citations omitted).

In a private action for securities fraud under Section 10(b), a complaint must satisfy heightened pleading requirements. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 321, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007). First, the complaint must state with particularity the circumstances constituting fraud or mistake. Fed. R. Civ. P. 9(b). In addition, the PSLRA requires "the complaint [to] specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). "To adequately plead scienter, the complaint must . . . 'state with particularity facts giving rise

to a strong inference that the defendant acted with the required state of mind.'" 15 U.S.C. § 78u-4(b)(2). "The pleadings must state precisely the time, place, and nature of the misleading statement, misrepresentations, and specific acts of fraud." Kaplan v. Rose, 49 F.3d 1363, 1370 (9th Cir. 1994). "Congress enacted the [Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4] to deter opportunistic private plaintiffs from filing abusive securities fraud claims, in part, by raising the pleading standards for private securities fraud plaintiffs." In re Silicon Graphics Sec. Litig., 183 F.3d 970, 973 (9th Cir. 1999) (citing H.R. REP. CONF. NO. 104-369, at 32–41 (1995); 15 U.S.C. § 78u-4(b)(1)–(2) (1997)). A court must dismiss a private security fraud action seeking money damages if the complaint fails to meet the pleading requirements. 15 U.S.C. § 78u-4(b)(3)(A).

## III. ANALYSIS

### A. Section 10(b) and Rule 10b-5

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), makes it unlawful "for any person . . . to use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe[.]" SEC Rule 10b-5 defines three categories of manipulative or deceptive devices that constitute a violation of Section 10(b):

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

A claim under Rule 10(b)-5 must allege six elements: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. See Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 341, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005). Defendants argue that Plaintiff has not adequately alleged the first two elements.

#### 1. Falsity

Defendants first contend that the action should be dismissed because Plaintiff fails to allege that any statement was false because of misstatement or omission when made. (Mot. 9.) For a statement to be actionable, the allegations must support both falsity and materiality at the time the statement as made.

Basic Inc. v. Levinson, 485 U.S. 224, 238, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988); Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 991 (9th Cir. 2009). A plaintiff must specify each statement alleged to be misleading and why the statement was false and misleading. 15 U.S.C. § 78u-4(b)(1); see In re GlenFed, Inc. Sec. Litig., 42 F.3d 1541, 1548–49 (9th Cir. 1994) (en banc) (superseded by statute on other grounds) ("[T]he plaintiff must set forth an explanation as to why the statement or omission complained of was false or misleading."). "[I]t is clearly insufficient for plaintiffs to say that a later, sobering revelation makes an earlier, cheerier statement a falsehood." In re Read-Rite Corp. Sec. Litig., 335 F.3d 843, 846 (9th Cir. 2003) (internal quotation marks and citations omitted). "A litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why those statements were false, does not meet this standard." Metzler Inv. GMBH v. Corinthian Colls., Inc., 540 F.3d 1049, 1070 (9th Cir. 2008). Furthermore, "it bears emphasis that § 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information. Disclosure is required . . . only when necessary to make statements made, in the light of the circumstances under which they were made, not misleading." Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 44, 131 S. Ct. 1309, 179 L. Ed. 2d 398 (2011) (internal quotation marks and ellipses omitted).

The statements alleged in the FAC to contain misrepresentations and omissions can be divided into the following three categories: (1) the success of the EMC acquisition, (3) the state of internal controls, and (2) synergies and earnings guidance.

**a. Success of acquisition**

The FAC alleges that Defendants materially misrepresented the success of Global Eagle's acquisition of EMC. In particular, the FAC alleges that one statement in November 2016 that the acquisition was "going well," and two statements in August and November 2016 that the acquisition was "well underway" were false. (FAC ¶¶ 38, 60.) The FAC asserts that, "[i]n reality, Global Eagle could not handle an acquisition the size of EMC and as a result, the acquisition worsened the Company's already materially weak internal controls." (Id. ¶ 39, see id. ¶ 60.)

Defendants argue that such statements were, at worst, non-actionable puffery. (Mot. 10.) "'Puffing' concerns expressions of opinion, as opposed to knowingly false statements of fact: 'When valuing corporations,[ ] investors do not rely on vague statements of optimism like "good," "well-regarded," or other feel good monikers. [A] mildly optimistic, subjective assessment hardly amounts to a securities violation.'" Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc., 774 F.3d 598, 606 (9th Cir. 2014) (quoting In re Cutera Sec. Litig., 610 F.3d 1103, 1111 (9th Cir. 2010)). "Statements by a company that are capable of objective verification are not 'puffery' and can constitute material misrepresentations." Id.

Plaintiff argues that statements of corporate optimism can become actionable where they are at odds with reality and where they are repeatedly emphasized. (Opp'n 18–19.) The FAC fails to state with particularity how Davis's vague statement in August 2016 that "integration is going well" was at odds with reality. In addition, this statement was accompanied by disclosures that the quarter was

"challenging" because of the acquisition. (FAC ¶ 58 (quoting Nov. 8, 2016 Earnings Call).) Contrary to Plaintiff's assertions, this statement is puffery and therefore is not actionable.

The FAC also alleges that Global Eagle's press releases in August and November 2016, that the acquisition was "well underway" were false because of the later-disclosed internal control issues. However, Plaintiff has not adequately alleged how weaknesses in internal controls would render a statement that integration was "well underway" false. There is no dispute that the acquisition took place. The progress of an acquisition is not defined solely by how well or quickly the company's internal controls adjust. Thus, Plaintiff has not adequately alleged that such statements were false. To the extent Plaintiff is trying to allege that inclusion of the word "well," signified that the acquisition had progressed further than it had, it has not done so with particularity, and such a statement would be subjective, non-actionable puffery as well.

Thus, Plaintiff has failed to allege that the statements regarding the success of acquisition were actionable misrepresentations. These statements cannot form the basis of a 10b-5 claim.

**b. State of internal controls**

The FAC alleges that Defendants misrepresented the state of internal controls in the August and November 2016 Form 10-Qs and in Sarbanes-Oxley certifications filed in support of those Form 10-Qs by omitting internal control information that was later disclosed. (See FAC ¶¶ 49, 66.) An omission is actionable only where disclosure is necessary "to make . . . statements made, in the light of the circumstances under which they were made, not misleading." SEC Rule 10b-5; Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 43, 131 S. Ct. 1309, 179 L. Ed. 2d 398 (2011). Thus, a misrepresentation may occur where a defendant discloses only part of the truth.

Here, Plaintiff asserts that Defendants' disclosures in November and March 2016 should have been made in prior statements. (See FAC ¶¶ 49, 66.) Such allegations of fraud made in hindsight are insufficient to state a claim for securities fraud. Each Sarbanes-Oxley certification stated that it was "based on [the certifier's] knowledge" and evaluations at the time of the report. The March 16, 2017 disclosure itself, as noted in the FAC, states that Defendants discovered the internal control weaknesses disclosed in that report "while preparing financial statements for the fiscal year ended December 31, 2016." (Id. ¶ 77 (quoting Form NT 10-K).) In addition, it is unclear whether the weaknesses arose before the August and November certifications were made. Because Plaintiff does not state with particularity that Defendants knew of the information contained in the later disclosures at the time the certifications were made, Plaintiff has failed to allege that these statements contained omissions or were otherwise false.

Similarly, the FAC alleges Global Eagle's November Form 10-Q, which disclosed several material weaknesses in internal controls, contained a material omission because it should have included the further weaknesses disclosed in March 2017. "Mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud." Acito v. IMCERA Grp.,

47 F.3d 47, 53 (2d Cir. 1995). Again, the FAC does not allege facts to suggest that the later-disclosed weaknesses existed in November 2016, or that Defendants knew of them at that time. Thus Plaintiff has not alleged a misrepresentation by omission with particularity.

Furthermore, Plaintiff's Opposition asserts that Global Eagle's August 9 Form 10-Q statement that "there have been no changes in our internal control over financial reporting during the three months ended June 30, 2016," is false for a new reason: in Global Eagle's November 9, 2016 Form 10-Q, "Defendants . . . revealed that '[d]uring the first half of 2016,' Global Eagle lacked internal controls 'over financial reporting.'" (Opp'n 14.) First, the FAC does not allege this as a reason for the August 9 statement's falsity. In addition, Plaintiff's paraphrase of the Form 10-Q is not wholly accurate. Rather than disclosing that during the first half of 2016 Global Eagle "lacked internal controls over financial reporting," the Form 10-Q instead states that "'we did not sufficiently focus on assessing the risks of material misstatement and implementing effective transaction level controls at WOI for purposes of our assessment of internal control over financial reporting as of December 31, 2016.'" (FAC ¶ 63 (quoting Nov. 9, 2016 Form 10-Q).) Plaintiff fails to explain how the November 9 statement rendered the August 9 statement false when made.

Thus, Plaintiff does not allege with particularity that internal control statements made in August or November 2016 were false when made or that their contents were known at the time of the previous statements. Therefore, these statements describing the state of internal controls cannot form the basis of a 10b-5 claim.

**c. Synergies and earnings guidance**

The FAC contends that the synergies and earnings guidance contained in the press releases issued on July 27, 2016, August 8, 2016, and November 8, 2016, and made during the earnings calls on those dates, was false and misleading because "Global Eagle's internal controls were so bad that Global Eagle did not have the capability to issue guidance or estimates but did so anyway." (FAC ¶ 44.) Plaintiff also alleges that these statements contained material omissions as they did not disclose the "dire state of internal controls," the additional stress the acquisition would put on internal controls, or Global Eagle's "inability to handle" the acquisition. These statements included guidance for the fourth quarter of 2016, full-year 2016, 2017, and 2018.

Under the PSLRA's safe harbor provision, forward-looking statements are generally not actionable. See 15 U.S.C. § 78u-5(c). "A 'forward-looking statement' is any statement regarding (1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions 'underlying or related to' any of these issues." No. 84 Emp.-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp., 320 F.3d 920, 936 (9th Cir. 2003) (citing 15 U.S.C. § 78u-5(i)). "[I]f a forward-looking statement is identified as such and accompanied by meaningful cautionary statements, then the state of mind of the individual making the statement is irrelevant, and the statement is not actionable regardless of the plaintiff's showing of scienter." In re Cutera Sec. Litig., 610 F.3d at 1112. "Alternatively, if a forward-looking statement is

not identified as such or is unaccompanied by meaningful cautionary statements, then the statement is actionable only if the plaintiff proves that the forward-looking statement 'was made with actual knowledge by that person that the statement was false or misleading.'" Police Ret. Sys. v. Intuitive Surgical, Inc., Case No.: 10-CV-03451-LHK, 2012 U.S. Dist. LEXIS 71429, at *26 (N.D. Cal. May 22, 2012), aff'd, 759 F.3d 1051, 1058 (9th Cir. 2014) (quoting 15 U.S.C. § 78u-5(c)(1)(B); citing Provenz v. Miller, 102 F.3d 1478, 1487 (9th Cir. 1996)); see also In re Lockheed Martin Corp. Sec. Litig., 272 F. Supp. 2d 944, 949 (C.D. Cal. 2003) ("[T]he PSLRA protects forward-looking statements if they either are accompanied by meaningful cautionary statements or were made without actual knowledge that the statements were false or misleading." (emphasis in original)).

Defendants argue that the FAC does not adequately allege that these statements were false. (Mot. 11–12.) In addition, Defendants assert that the PSLRA's safe harbor provision should apply to protect these statements, which were allegedly accompanied by meaningful cautionary statements and were not knowingly false when made. (Mot. 13–14 & n.6.)

The reasonableness of the basis for making projections is relevant to whether the statement was false when made. In re Oracle Corp. Sec. Litig., 627 F.3d 376, 388 (9th Cir. 2010); Provenz v. Miller, 102 F.3d 1478, 1487 (9th Cir. 1996); Marx v. Computer Sci. Corp., 507 F.2d 485, 490 (9th Cir. 1974). The FAC alleges that Global Eagle's February 2017 statement that "investors should no longer rely upon any previous estimates that we have made" demonstrated that Global Eagle did not have adequate internal controls when guidance was previously issued. (FAC ¶ 70.) This is insufficient to allege with particularity that the internal controls were so weak at the time the projections were made that Defendants had no reasonable basis for making them.

As an alternative basis for pleading falsity, Plaintiff alleges that the earnings and synergy guidance statements contained material omissions that rendered them misleading, and thus, actionable. In particular, Plaintiff alleges that Global Eagle should have disclosed (a) "the already dire state of internal controls"; (b) "the additional stress that an acquisition the size of EMC would have on the Company"; and (c) that "Global Eagle could not handle an acquisition the size of EMC" when it issued guidance during the class period.[4/] (See id. ¶¶ 36, 39, 44, 93.)

Plaintiff alleges that Defendants failed to disclose the "dire state of internal controls" at the time guidance was issued, rendering guidance misleading. However, Defendants had disclosed internal control problems to investors caused by the 2015 WOI acquisition and warned that Global Eagle may be exposed to internal control weaknesses with future acquisitions, including EMC. (RJN, Ex. C.) Moreover, Plaintiff does not adequately explain how failure to state that the internal controls were "dire" rendered the projections misleading.

---

[4/] To the extent Plaintiff alleges such omissions as to the statements of success of acquisition and state of internal controls, this analysis applies equally. (See, e.g., FAC ¶ 39.)

Next, Plaintiff alleges that it was a material omission for Defendants to fail to warn investors of the additional stress Global Eagle would suffer by acquiring a company the size of EMC. However, Defendants repeatedly warned that guidance could prove inaccurate depending on a variety of factors including "our ability to integrate our acquired businesses, the ability of our business to grow, including through acquisitions which we are able to successfully integrate, and the ability of our executive officers to manage growth profitably; any delay or inability to realize the expected benefits and synergies of the EMC acquisition . . . ." (RJN, Ex. D; see, e.g., id., Exs. I, J, K.) Also, only months before the EMC acquisition, Global Eagle had also warned investors that acquisitions could expose Global Eagle to additional risks including "controls in the acquired business." (Id., Ex. C.) In addition, the FAC does not adequately explain how failing to specifically warn investors that the size of EMC could cause additional stress to Global Eagle rendered the projections misleading.

Finally, Plaintiff argues that Global Eagle's failure to disclose that it could not handle an acquisition the size of EMC rendered guidance misleading. Plaintiff has provided no explanation for what "unable to handle" means, or why omission of such a subjective statement rendered Defendants' guidance misleading. There is no dispute that Global Eagle did in fact acquire EMC. Thus, the FAC fails to allege that failing to state that Global Eagle was "unable to handle" the EMC acquisition rendered guidance misleading.

Because the FAC does not adequately allege that the synergy or earnings guidance had no reasonable basis or that it contained material omissions, the FAC does not adequately allege that these statements were false when made.

Furthermore, even if the statements contained misrepresentations, they would be protected under the PSLRA as future-looking statements. Plaintiff asserts that these statements are not forward-looking because the FAC asserts only that the state of internal controls contemporaneous with the statements precluded Defendants from issuing guidance, i.e., that there was no reasonable basis for the projections. (Opp'n 11.) However, the complained of statements are clearly projections, goals, and statements of future economic performance, and thus fall within the definition of a "forward-looking statement" under the PSLRA.[5/] 15 U.S.C. § 78u-5(i)(1); In re Cutera Sec. Litig., 610 F.3d at 1111 ("[An] earnings projection is by definition a forward-looking statement.").

---

[5/] On August 8, 2016, defendant Davis asserted that Global Eagle was "on track" to meet certain future financial goals. In this circumstance, the phrase "on track" does not change the fact that such a statement is forward-looking. This phrase indicates that at that time, based on the information available to the speaker, the goals were reasonable. This is implicit in any forward-looking statement. See Marx, 507 F.2d at 490 (concluding that a forecast would be "untrue" if the speaker did not believe it would be true, knew of a reason to believe it would not be true, or where the statement lacked preparation or a valid basis).

To establish actual knowledge of falsity at the time the projections were made, the FAC relies on Defendants' later statements disclosing weaknesses in internal controls. Such speculation based on later disclosures does not state with particularity that Defendants actually knew the projections were false at the time they were issued. Thus, the PSLRA's safe harbor provision protects Defendants' guidance, and it is not actionable.

Because Plaintiff fails to allege with particularity that the projections were false or misleading when made and because they are protected by the safe harbor provision, the synergy and earnings guidance are not actionable.

For these reasons, Plaintiff has failed to adequately allege any actionable misrepresentation or omission.

**2. Scienter**

Defendants argue that even if the FAC had adequately pleaded actionable misrepresentations, Plaintiff failed to bear its burden of pleading scienter. (Mot. 18.) To survive a motion to dismiss, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2); In re Cutera Sec. Litig., 610 F.3d at 1112. Specifically, scienter requires an intent to deceive, manipulate, or defraud. Tellabs, Inc., 551 U.S. at 319, 127 S. Ct. 2499, 168 L. Ed. 2d 179. The standard is not whether a reasonable person can draw an inference that the defendant acted with scienter. Id. at 317, 127 S. Ct. 2499, 168 L. Ed. 2d 179. "To adequately demonstrate that the 'defendant acted with the required state of mind,' a complaint must 'allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness." Zucco Partners, LLC, 552 F.3d at 991 (internal citation omitted). "[F]acts showing mere recklessness or a motive to commit fraud and opportunity to do so . . . are not sufficient to establish a strong inference of deliberate recklessness." In re Silicon Graphics Sec. Litig., 183 F.3d at 974. "[T]he plaintiff must plead a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." Zucco Partners, LLC, 552 F.3d at 991 (internal quotation marks and citation omitted). The Supreme Court has elaborated that to qualify as "strong," "an inference of scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, Inc., 551 U.S. at 313, 127 S. Ct. 2499, 168 L. Ed. 2d 179. "A court must compare the malicious and innocent inferences cognizable from the facts pled in the complaint, and only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference." Zucco Partners, LLC, 552 F.3d at 991. Courts may initially assess allegations individually, and then consider whether the allegations collectively meet the standard for pleading scienter. See Police Ret. Sys., 759 F.3d at 1058; see, e.g., id. at 1062–64; Metzler Inv., 540 F.3d at 1066–69.

The FAC alleges that the following factors create a strong inference of scienter: (1) the consideration by the compensation committee of Global Eagle's board of Adjusted EBITDA as one factor for the bonus pool; (2) executive resignations; and (3) Defendants' purported knowledge of the falsity of their statements.

**a. Group publication presumption**

As an initial matter, Defendants argue that the PSLRA does not permit group pleading, and that the FAC does not plead scienter separately as to each individual defendant. (Mot. 19–20.) Where a plaintiff seeks to hold individuals and a company liable for securities fraud, the PSLRA requires that he allege scienter with respect to each individual defendant. Or. Pub. Emps. Ret. Fund, 774 F.3d at 607. However, a court may "impute scienter to individual defendants in some situations, for example, where [it finds] that a company's public statements are so dramatically false that they would create a strong inference that at least some corporate officials knew of the falsity upon publication." Id. (internal quotation marks and brackets omitted); see Berry v. Valence Tech., Inc., 175 F.3d 699, 706 (9th Cir. 1999) (observing that a claim will fail if it fails to "link the individual in question to the claims against the defendant corporation"); Howard v. Everex Sys., 228 F.3d 1057, 1061 (9th Cir. 2000) ("[S]igners of documents should be held responsible for the statements in the document."); In re Secure Computing Corp. Sec. Litig., 120 F. Supp. 2d 810, 821 (N.D. Cal. 2000) (finding allegations sufficient at the pleading stage to apply the group publication presumption to individual defendants, despite a lack of any alleged misstatement by these defendants); In re Nash Finch Co. Sec. Litig., 502 F. Supp. 2d 861, 878 (D. Minn. 2007) ("[T]he group pleading doctrine remains available to attribute group published documents, such as press releases, to those individuals with direct involvement in the everyday business of the company." (internal quotation marks omitted)). "The doctrine is limited in scope and applies only to clearly cognizable corporate insiders with active daily roles in the relevant companies or transactions." In re Raytheon Sec. Litig., 157 F. Supp. 2d 131, 152 (D. Mass. 2001) (internal quotation marks omitted).

Here, two individuals remain named as Defendants – Davis and Severson. The FAC alleges that "Each individual defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected . . . . The Individual Defendants are liable for the false statements pleaded herein, as those statements were each 'group-published' information, the result of the collective actions of the Individual Defendants." (FAC ¶ 18.)

Plaintiff's attempt to attribute all statements to all individual Defendants, is not permissible. First, the oral statements in earnings calls are not "group-published," and therefore can be attributed to the speaker only. See Pegasus Holdings v. Veterinary Ctrs. Of Am., Inc., 38 F. Supp. 2d 1158, 1165 (C.D. Cal. 1998). In addition, because Severson took office as Global Eagle's CFO on August 24, 2016, there is no basis for attributing earlier group-published statements to him. However, at this stage, there seems to be an adequate basis to apply the group publication presumption to the remaining statements in Global Eagle press releases and SEC filings, given the individual Defendants' participation in earnings calls addressing those publications and their signing of the SEC filings and Sarbanes-Oxley

certifications. The group-publication presumption therefore could allow individual Defendants to be liable for those group-published statements. The Court next considers whether Plaintiff's specific allegations create a strong inference of scienter.

**b. Executive bonuses**

Plaintiff asserts that because "Adjusted EBITDA is one of the primary measures used by the compensation committee of the board of directors to establish the funding targets for the annual bonus pool for the employees and executives," individual Defendants had a motive to misrepresent how well the EMC acquisition was progressing.[6/] (FAC ¶¶ 27, 83.) "Incentive compensation can hardly be the basis on which an allegation of fraud is predicated." Acito, 47 F.3d at 54 (internal quotation marks omitted) (holding that "the existence, without more, of executive compensation dependent upon stock value does not give rise to a strong inference of scienter"). Plaintiff alleges that Defendants chose to acquire EMC to inflate Adjusted EBITDA. (FAC ¶ 29.) As Plaintiff notes, in 2015, the annual incentive payouts for the individual Defendants were 45% based on achievement of pre-bonus Adjusted EBITDA targets. (Id. ¶ 87.) The FAC further alleges that "[b]y encouraging an environment of inadequate internal controls, the Defendants were able to inflate Adjusted EBITDA and gain financially." (Id. ¶ 88.) After the individual Defendants left Global Eagle, the accounting policy changed in such a way that decreased Adjusted EBITDA, which Plaintiff proposes is indicative of their intent to deceive investors. (Id.) The Court finds that the FAC's strained allegations of a possibility of higher bonuses for the individual Defendants do not support a strong inference that they intentionally or recklessly made misstatements to deceive investors.

**c. Executive resignations**

Plaintiff suggests that the four executive resignations between August 2016 and March 2017 are indicative of scienter. (Id. ¶ 97.) Resignations and terminations "may in some circumstances be indicative of scienter . . . ." Zucco Partners, LLC, 552 F.3d at 1002. However, "[a] plaintiff must allege sufficient information to differentiate between a suspicious change in personnel and a benign one." Id. Plaintiff alleges that Davis, Severson, and Muller's resignations "just weeks prior to the final corrective disclosure are . . . indicative of scienter . . . . [T]he timing supports an inference that they were pushed out of office due to their materially false and/or misleading statements concerning the Company's internal controls and guidance." (FAC ¶ 99.) Plaintiff provides no basis for this assertion. Contrary to Plaintiff's conjecture, while these resignations may provide some support for an inference of scienter, they more readily support an inference that they were pushced out for mismanaging the EMC acquisition, or that they resigned for some other innocent reason. In addition, Plaintiff speculates that Zemetra was "pushed out" after having a change of heart about making misrepresentations. (Id. ¶ 98)

[6/] The Court disregards Plaintiff's argument as to Severson's potential individual financial gain, as it is not alleged in the FAC. (See Opp'n 20–21.)

Such conclusions reached by Plaintiff, unsupported by allegations of fact, do not meet the particularity requirements of the PSLRA, and do not support a strong inference of scienter.

**d. Knowledge of falsity**

The FAC alleges that Defendants knew of the falsity of their statements, and that this knowledge creates a strong inference that Defendants acted with intent or deliberate recklessness. In support of its theory, Plaintiff points to Defendants' knowledge that previous smaller acquisitions had weakened Global Eagle's internal controls; Sarbanes-Oxley certifications by individual Defendants attesting that they had performed reasonable investigations; executive resignations; and individual Defendants' positions.

i. Prior acquisitions

Plaintiff asserts that despite Global Eagle's history of suffering from material weaknesses in internal controls when acquiring smaller businesses, "Defendants and Global Eagle represented to investors that the integration of EMC was going well and disseminated information without any reasonable basis that the acquisition of EMC, a much larger company, would be any different." (Id. ¶ 92.) While knowledge of such past internal control weaknesses would suggest that Defendants knew that the acquisition could harm Global Eagle's internal controls, it is not indicative of actual knowledge that weaknesses caused by the EMC acquisition already existed at the time the statements were made. Therefore, this consideration does not establish knowledge of falsity and provides little support for a strong inference of intent or deliberate recklessness to deceive investors by making the above statements.

ii. Sarbanes-Oxley certifications

In addition, the FAC suggests that the Sarbanes-Oxley certifications required Defendants to "[e]valuate[] the effectiveness of the registrant's disclosure controls," and thus, they had actual knowledge of internal control defects when they made the statements. (Id. ¶¶ 94, 95.) However, as the Ninth Circuit has held, boilerplate Sarbanes-Oxley certifications are insufficient to establish scienter, and do not add to otherwise insufficient allegations of scienter. Zucco Partners, LLC, 552 F.3d at 1004. Accordingly, these certifications do not suggest Defendants' knowledge of falsity or support a strong inference of intent or deliberate recklessness.

iii. Core-function

Finally, the FAC asserts that "the core-function of the CEO and CFO's [sic] is to monitor and ensure adequate internal controls of the Company," and, therefore, that the individual Defendants knew of the internal control failures when they made the foregoing statements. (FAC ¶ 96; see also id. ¶ 118.) The Ninth Circuit has held that a defendant's position in the company may create a strong inference of scienter in limited circumstances.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 17-1479 PA (MRWx) | Date | August 20, 2017 |
|---|---|---|---|
| Title | M & M Hart Living Trust v. Global Eagle Entertainment, Inc., et al. | | |

> [A]llegations regarding management's role in a company may be relevant and help to satisfy the PSLRA scienter requirement in three circumstances. First, the allegations may be used in any form along with other allegations that, when read together, raise an inference of scienter that is cogent and compelling, thus strong in light of other explanations. This view takes such allegations into account when evaluating all circumstances together. Second, such allegations may independently satisfy the PSLRA where they are particular and suggest that defendants had actual access to the disputed information . . . . Finally, such allegations may conceivably satisfy the PSLRA standard in a more bare form, without accompanying particularized allegations, in rare circumstances where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter.

S. Ferry LP, No. 2 v. Killinger, 542 F.3d 776, 785–86 (9th Cir. 2008) (internal quotation marks and citations omitted); Zucco Partners, LLC, 552 F.3d at 1000. However, "plaintiffs may not argue, based only on defendants' prominent positions in the company, that they ought to have known better. Instead, the PSLRA requires 'particular allegations which strongly imply Defendant[s'] contemporaneous knowledge that the statement was false when made.'" Berson v. Applied Signal Tech., Inc., 527 F.3d 982, 989 (9th Cir. 2008) (quoting In re Read-Rite, 335 F.3d 843, 847 (9th Cir. 2003)). Plaintiff's allegations of individual Defendants' positions are not sufficiently particular to suggest that Defendants had actual knowledge of their statements' falsity at the time they were made. Nor has Plaintiff alleged that the statements are of such a nature that "it would be absurd to suggest that [individual Defendants were] without knowledge of the [statements' falsity]." S. Ferry LP, No. 2, 542 F.3d at 786. Therefore, as alleged, individual Defendants' positions, do not establish a strong inference of scienter.

**e. FAC allegations as a whole**

A final determination of whether scienter exists requires a holistic consideration of whether all facts alleged, including those that are vague or ambiguous, raise a strong inference of scienter. S. Ferry LP, 542 F.3d at 784; see Tellabs, Inc., 551 U.S. at 325, 127 S. Ct. 2499, 168 L. Ed. 2d 179 ("We reiterate, however, that the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically."). Having considered all of the facts alleged in the FAC, and compared the malicious and innocent inferences that can be drawn from them, the Court finds the malicious inferences proposed by Plaintiff less likely than innocent explanations. Plaintiff's allegations support, at most, an inference that Global Eagle suffered from poor management. "It is well settled that section 10(b) was not designed to regulate corporate mismanagement." Acito, 47 F.3d at 53 (internal quotation marks and citations omitted). For all of these reasons, Plaintiff has failed to adequately allege scienter as to

individual Defendants.[7/] Furthermore, because Plaintiff has not adequately alleged scienter as to any individual Defendant, Plaintiff has failed to allege scienter of Global Eagle as well. See Glazer Capital Mgmt., LP v. Magistri, 549 F.3d 736, 744–45 (9th Cir. 2008).

Because Plaintiff has not adequately alleged falsity of statements or scienter of the individual Defendants, Plaintiff's Section 10(b) and Rule 10b-5 claim fails.

**B. Section 20(a)**

To state a claim under Section 20(a), a plaintiff must allege (1) a primary violation of federal securities law and (2) that the defendant exercised actual power or control over the primary violator. Howard, 228 F.3d at 1065. For the reasons discussed above, Plaintiff has failed to state a claim for a primary violation of the securities law. Therefore, Plaintiff's Section 20(a) claim also fails.

**Conclusion**

For all the foregoing reasons, Defendants' Motion to Dismiss is granted and the FAC is dismissed with leave to amend. A Second Amended Complaint, if any, shall be filed on or before September 11, 2017. If Plaintiff elects not to file a Second Amended Complaint, this action will be dismissed. Plaintiff's Motion for Leave to File a Second Amended Complaint (Docket No. 47), Defendants' Motion to Strike Plaintiff's Motion for Leave to Amend (Docket No. 49), and Defendants' Application to File Documents in Support of its Opposition to Plaintiff's Motion for Leave to Amend Under Seal (Docket No. 51) are denied as moot.

IT IS SO ORDERED.

---

[7/] In its Opposition, Plaintiff attempts to introduce statements of two confidential witnesses not contained in the FAC. (Opp'n 5–8.) The Court does not consider such allegations, as they are not within the operative complaint, and are not the proper subject of judicial notice.