**LEVI & KORSINSKY LLP**
Adam C. McCall (SBN 302130)
445 South Figueroa St., 31st Floor
Los Angeles, CA 90071
Tel: 213/985-7290
Fax: 202/333-2121
Email: amccall@zlk.com

*Co-Lead Counsel for Lead Plaintiff*
*M & M Hart Living Trust,*
*Randi Williams and the Class*

[*additional counsel on signature page*]

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| M & M HART LIVING TRUST and RANDI WILLIAMS, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>GLOBAL EAGLE ENTERTAINMENT INC., DAVID M. DAVIS, and THOMAS E. SEVERSON JR.,<br><br>Defendants. | Case No. 2:17-CV-01479-PA-MRW<br><br>**<u>CLASS ACTION</u>**<br><br>**SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL**<br><br>Judge: Hon. Percy Anderson |

Lead Plaintiff M & M Hart Living Trust and Plaintiff Randi Miller (collectively, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, allege in this Second Amended Complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to their own acts, and upon facts obtained through an investigation conducted by his counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by Global Eagle Entertainment, Inc. ("Global Eagle" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Global Eagle's public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; (d) interviews of confidential witnesses; and (e) information readily obtainable on the internet.

Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Plaintiffs continue to await the release of Global Eagle's past due quarterly and annual reports, including the annual report (Form 10-K) for the period ended December 31, 2016 and the quarterly reports (Form 10-Q) for the periods ended March 31 and June 30, 2017, which Plaintiffs believe will contain additional details concerning the allegations set forth herein. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons or entities who purchased or otherwise acquired Global Eagle common stock between July 27, 2016, and March 16, 2017, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws. Plaintiffs' lawsuit centers on Defendants' false and/or materially misleading statements about Global Eagle's acquisition of Emerging Markets Communications ("EMC").

Despite providing investors with updates on the status of Global Eagle's integration with EMC, Defendants had no way of knowing whether these statements were true.

2. Global Eagle provides content, connectivity, and digital media solutions for the travel industry. In July 2016, the Company acquired EMC for approximately $166.5 million. The acquisition left Global Eagle with EMC's outstanding debt, which amounted to more than $370 million. Throughout the Class Period, Defendants misled investors about the success of the acquisition, making outlandish and ungrounded statements such as that the Company would "realize synergies of $15 million in 2017, growing to $40 million in 2018 and thereafter" from the acquisition of EMC. However, Defendants failed to inform investors that their internal controls were so materially deficient that Global Eagle was unable to accurately project guidance or estimate revenue from the combined companies.

3. The truth behind Defendants' actions has only recently come to light. Contrary to their prior statements, Defendants have recently revealed that due to the acquisition of EMC, investors should no longer rely upon any previous estimates that Global Eagle had made and that the Company could not make reasonable estimates of its results of operations. Further, Global Eagle announced that it would be late in filing its annual report (Form 10-K) for 2016 and Global Eagle's disclosure controls and procedures and internal control over financial reporting were not effective as of December 31, 2016 due to: (i) material weaknesses that Global Eagle previously reported but has not yet fully remedied; and (ii) additional material weaknesses in internal control over financial reporting in the areas of revenues, license-fee expenses, inventory, internally developed software, goodwill impairment and accounting for business combinations, as well as at the entity level affecting two COSO components relating to control environment and risk assessment.

4. Over the course of the Class Period, the truth about Global Eagle's internal controls and inability to issue estimates or guidance slowly leaked into the market. As a

result, the price of Global Eagle's common stock declined approximately 64%, from a Class Period high of $9.73 per share, to $3.50 per share at close on March 17, 2017, a drop of $6.23 per share.

5. As a result of Defendants' wrongful acts and omissions, and the decline in the market value of the Company's common shares, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

6. The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

7. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

8. Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as Global Eagle is headquartered in this District and a significant portion of its business, actions, and the subsequent damages to Plaintiffs and the Class, took place within this District.

9. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

10. Lead Plaintiff M & M Hart Living Trust ("M & M Hart") purchased Global Eagle common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. M & M Hart has concurrently filed a new certification evidencing its transactions in Global Eagle securities. M & M Hart's certification is incorporated herein by reference.

11. Plaintiff Randi Williams ("Williams") purchased Global Eagle common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Williams has concurrently filed her certification evidencing her transactions in Global Eagle securities. Williams' certification is incorporated herein by reference.

12. Global Eagle is a Delaware corporation with its principal executive offices located at 4553 Glencoe Avenue, Los Angeles, California 90292. During the Class Period, the Company's common stock traded on the NASDAQ Stock Market (the "NASDAQ") under the symbol "ENT."

13. Defendant David M. Davis ("Davis") served as the Company's Chief Executive Officer ("CEO") and Director from July 2014 until his termination from the Company effective February 20, 2017.

14. Defendant Thomas E. Severson, Jr. ("Severson") served as the Company's Chief Financial Officer ("CFO") from August 2016 until his termination from the Company effective February 20, 2017.

15. Defendants Davis and Severson are sometimes referred to herein as the "Individual Defendants." Global Eagle together with the Individual Defendants are referred to herein as the "Defendants."

16. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Global Eagle's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being

concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

17. Global Eagle is liable for the acts of the Individual Defendants, and its employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful act complained of herein were carried out within the scope of their employment with authorization.

18. The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to Global Eagle under *respondeat superior* and agency principles.

## RELEVANT NON-PARTIES

19. Michael Zemetra ("Zemetra") served as the Company's CFO from November 2014 until his resignation in August 2016. Davis forced Zemetra to resign after Zemetra confronted Davis about the Company's lack of internal controls over financial reporting.

20. **Confidential Witness 1** ("CW1") was the Director of Global Marketing Communications for Global Eagle from August 2015 until September 2016. CW1 was tasked with supervising a staff consisting of analysts and designers. CW1 had access to the relevant information in the Complaint due to her position in the Company. Further, CW1 worked directly with the insiders to issue relevant press releases relating to the projections and announcements.

21. CW1 revealed that the overall financial statements of Global Eagle were in "disarray" from the time CW1 started working for Global Eagle until the day CW1 left. For example, CW1 indicated that a red flag with the internal controls of Global Eagle was the fact that CW1 could never receive budget information for her department for prior years. CW1 stated that "it was never a problem" if there were expenses that went over

budget. CW1 indicated that the internal numbers just did not add up and that it was a "mystery" as to how much money was being spent and generated within Global Eagle.

22. CW1 revealed that CW1 was directly involved with the EMC acquisition in the later stages. CW1 also specified that Global Eagle's acquisitions were not made with complete due diligence and that there was a "fast and furious" process regarding acquisitions. CW1 recalled that a lot of satellite deals were done on a trial basis at the expense of Global Eagle and that some acquisitions were never properly integrated regarding financial reporting and controls. CW1 indicated that the acquisitions were a complete disaster and that there was "funny math" going on internally. Specifically, CW1 revealed that Davis would do whatever it took to make acquisitions happen and that Davis did not care about the math, concerns, or problems with the acquisitions. According to CW1, Davis was extremely involved in these situations and knew about the internal problems when acquiring companies.

23. According to CW1, the synergies and projected future guidance due to the EMC acquisition were purely based on EMC's existing contracts and projecting those contracts forward and not on any independent basis.

24. Further, CW1 stated that there was an internal concern regarding the acquisition of EMC, the lack of staff available to deal with the acquisition, and the integration of financial systems. According to CW1, there was a lack of full comprehension regarding how to integrate and streamline EMC. CW1 revealed that there was not a full compliance team when it came to the acquisition of EMC and that "a lot of things were done haphazardly and at the last minute." For example, CW1 stated that Global Eagle's guidance after the EMC merger was simply based on the contracts that EMC had and future projections of those contracts. Global Eagle just added EMC's projections onto their own without doing a proper forecast.

25. CW1 further indicated that there were constant staff reductions at Global Eagle to lower overhead and make it look like Global Eagle had more cash available. As

a result, the fact that Global Eagle was "understaffed" to handle the acquisition of EMC was an "understatement." CW1 stated that Global Eagle became very top heavy with executives because the staff reductions were made for positions that were involved in more "tedious" or detailed activities. CW1 thought that morale during the acquisition of EMC was low because everyone was "treated like a work horse." For example, due to the lack of staff and the massive workload, no employee had time to complete their projects even while working 10-12 hours a day. Each layoff, termination, or staff reduction created more stress and pressure on the remaining employees.

26. CW1 also believed that the Company indicated that Zemetra left to pursue "other opportunities," when, in fact, Zemetra's departure was involuntary and "not pleasant." CW1 believes that Zemetra's job had been in "grave jeopardy" because certain financial numbers were not adding up. CW1 suspects that when Zemetra pressed Davis in an attempt to "balance" the numbers out, that Zemetra was involuntarily let go. CW1 went on further stating that CW1 personally had to let a couple of employees go based on Davis' suggestions, not performance. CW1 believed that Davis was partially responsible for many of the departures at Global Eagle. According to CW1, Davis had an "odd way of managing" and that Davis was a micro-manager who would terminate anyone based on a disagreement. If anyone challenged Davis or brought up any red flags, the employee "would be gone."

27. **Confidential Witness 2** ("CW2") worked as Director of the Systems Engineering Integration and Test (SEIT) division from May 2, 2016 until February 16, 2017. CW2 was partially responsible for the integration of EMC and also managed vendors during the design and production of Global Eagle's equipment. CW2 oversaw an annual budget of $4.2 million. CW2 revealed that during CW2's time at Global Eagle the integration of EMC went poorly. CW2 stated that EMC was bigger than Global Eagle and because there were so many problems integrating EMC, Global Eagle tried to flip it around so that it seemed like EMC was acquiring Global Eagle onto their books.

28. According to CW2, the finances and more specifically the accounting controls of Global Eagle was "off" from the moment CW2 started working at Global Eagle. CW2 stated that there were only approximately 3-5 accountants in the entire company. CW2 stated that whenever CW2 asked about budget and the ability to exceed it, CW2 did not receive any answers and management did not care. CW2 stated there was no way the accounting could have been right because Global Eagle did not know how much was being spent. Further, CW2 revealed that internal controls were bad because the vendors constantly complained of not being paid. When CW2 brought this up to management, Global Eagle stated it had to wait to pay the vendors until it received more cash flow.

29. CW2 stated that Davis' main priority was EBITDA. CW2 believed that the acquisition of EMC was partially just to raise the top line and increase EBITDA.

30. CW2 also indicated that employees were consistently let go. CW2 said that it is not likely that Zemetra left to pursue other opportunities but rather that he was actually forced out by Davis and replaced by Severson from EMC.

## SUBSTANTIVE ALLEGATIONS

### A. Global Eagle is an acquisition vehicle with deficient internal controls.

31. Global Eagle provides a wide range of in-flight, maritime and land-based connectivity solutions, including Wi-Fi, movies, television, music and interactive software, as well as portable entertainment solutions, content management services, e-commerce solutions and original content development.

32. The Company operates through two segments, Connectivity and Content. The Connectivity segment offers Wi-Fi Internet connectivity through Kuband satellite transmissions. This segment offers specialized network equipment, media applications, and premium content services that allow airline passengers to access in- flight Internet, live television, on-demand content, texting services, shopping, and flight and destination information, as well as real-time data and operations solutions. The Connect segment

selects, manages, and distributes wholly-owned and licensed media content, video and music programming, applications, digital advertising solutions, and video games to airline, maritime, and other away-from-home non-theatrical markets.

33. Global Eagle was founded on January 31, 2013 when it acquired Row 44, Inc. and 86% of the outstanding shares of Advanced Inflight Alliance AG stock. Prior to 2013, Global Eagle was previously known as Global Eagle Acquisition Corp. Global Eagle Acquisition Corp. had no business dealings except for raising funds for the 2013 acquisitions. Although Global Eagle changed its name to Global Eagle Entertainment, its original name, Global Eagle Acquisition Corp., is better suited. Unlike other companies, Global Eagle grew by constantly acquiring outside companies instead of organically. In just three and a half years, between January 31, 2013 and July 27, 2016 (the start of the Class Period), Global Eagle acquired 10 different companies, an average of over 2.5 companies per year.

34. Global Eagle consistently struggled acquiring even the smallest of companies. For example, in 2014, Global Eagle failed to "implement and maintain effective [information technology general controls] across certain subsidiaries [it] acquired in 2013." 2014 Form 10-K, p. 65. Further, in 2015, Global Eagle's "assessment of internal control over financial reporting did not include the internal control over financial reporting of four businesses acquired during the year . . . ." 2015 Form 10-K, p. 66. Global Eagle blamed this on a lack of a sufficient number of personnel to execute a timely financial close and properly accumulate certain analysis and reconciliations consistently in a timely and accurate manner. *Id.*

35. In addition, Global Eagle promised investors that "[d]uring 2016, our management is committed to remediating the material weakness through continuing training of personnel, improving the timeliness of our accounting close process, and continuing to enhance our financial review controls." *Id.* However, despite its admitted

struggles integrating acquired companies, its constant firings and lack of internal controls, Global Eagle went forward with its biggest acquisition yet.

**B. Global Eagle acquires EMC while knowing that it does not have the controls to successfully integrate the companies.**

36. On July 27, 2016, Global Eagle completed the acquisition of EMC. EMC is a communications services provider that offers land-based sites and marine vessels globally a multimedia platform delivering communications, Internet, live television, on-demand video, voice, cellular and 3G/LTE services. EMC claims to leverage its satellite-terrestrial-cellular broadband network with fully meshed Multiprotocol Label Switching ("MPLS") interconnected teleports. EMC has a portfolio of patented technologies. EMC's maritime and land businesses comprise a separate service line within the Connectivity reporting segment.

37. The total consideration paid to the member unit holders of EMC for 100% of their membership interests, had a value of approximately $166.5 million and consisted of (i) $45.5 million in cash paid at closing, (ii) the issuance of approximately 5.5 million newly issued shares of Company common stock at closing, (iii) the redemption for cash of approximately $55.1 million of existing seller preferred stock, and (iv) deferred consideration of $25 million to be paid in cash or newly issued shares of the Company's common stock (at the Company's option) within one year. The Company also effectively settled a pre-existing relationship with a subsidiary of EMC resulting in additional consideration of $0.2 million.

38. In connection with the acquisition, the Company assumed approximately $370.8 million of EMC indebtedness, which represents the fair value of the debt on the EMC Acquisition Date.

39. The total acquisition price for EMC (equity and debt) was $537.3 million, which was more than all of Global Eagle's past acquisitions combined ($524.4 million).

40. Defendants knew that acquiring EMC would result in further accounting deficiencies due to Global Eagle's admitted lack of controls and necessary accounting and other executive personnel.

**C. Defendants told investors that Global Eagle was successfully integrating EMC and provided the public with specific revenue estimates without having any way to know if their statements were true.**

41. According to the confidential witnesses who were both involved at some point in the acquisition or integration of EMC, Global Eagle's internal controls were in "disarray" and were "off" from the moment they began working there. CW1 stated that Davis had a "fast and furious" process regarding acquisitions and did not perform the proper due diligence when acquiring EMC. Despite the "funny math" going on internally, Davis issued materially false synergy and earnings estimates based purely on EMC's existing contracts and not on any independent basis.

42. Throughout the Class Period, Davis continually issued synergy and earnings estimates and on August 8, 2016, promised investors that Global Eagle was "on track" for $15 million in savings in 2017. In reality, as revealed on October 10, 2016, Global Eagle had material weaknesses in the quality of information used in its financial controls and as a result, did not know if it was able to produce reliable or accurate financial statements. Global Eagle disclosed that due to the focus on the EMC transaction and lack of personnel, Global Eagle had material weaknesses in internal controls related to the "completeness and accuracy of underlying data used in the performance of controls over accounting transactions and disclosures" and "effective monitoring of our controls." Global Eagle specifically stated that it could not "address the risk of material misstatement to our financial statements."

43. Despite knowing that Global Eagle's financials may have a material misstatement, Davis and Severson ignored this risk and continued to issue synergy and earnings estimates. As a direct result of Davis' and Severson's deliberate recklessness, on

February 21, 2017, Global Eagle announced that Davis and Severson would be leaving the Company. At the same time, Global Eagle announced that it would be delayed in its 2016 Form 10-K filing, and told investors that they should no longer rely on Global Eagle's previously issued estimates that were issued by Davis and Severson.

44. Accordingly, Defendants misled investors into purchasing Global Eagle stock at artificially inflated prices.

## FALSE AND MATERIALLY MISLEADING STATEMENTS

45. Defendants made false and materially misleading statements relating to: (1) the success of Global Eagle's acquisition of EMC; (2) Global Eagle's expected synergies and earnings; and (3) the state of Global Eagle's internal controls.

### A. Defendants misled investors when discussing the success of Global Eagle's acquisition of EMC.

*August 8, 2016 Earnings Call*

46. On August 8, 2016, after trading hours, Global Eagle held an earnings call to discuss the Company's second quarter results and the acquisition of EMC (the "August Earnings Call"). On the August Earnings Call, Davis discussed the progress Global Eagle had made integrating EMC into Global Eagle's business. Davis stated in relevant part:

> Good afternoon, everyone, and thanks for joining our second quarter 2016 earnings call. In addition to Kevin, joining me on today's call are Mike Zemetra, our CFO, and Avel Avellan, GEE's new President and Chief Strategy Officer. Abel was the founder and CEO of EMC. As you all know we closed our previously announced acquisition of EMC at the end of July. I want to start by reiterating how pleased I am with the EMC acquisition. It's a truly transformation transaction for our Company. With EMC we become a leading provider of global satellite based connectivity and content to rapidly growing mobility markets across air, sea and land, significantly expanding our addressable market.
>
> As a combined company, GEE's revenue base is now better diversified and split equally between media content and connectivity sale. The integration

> process is well underway, and we expect to realize significant cost savings from this acquisition. ***We are on track for $15 million in savings in 2017***, growing to at least $40 million in 2018 and thereafter. Over the past three years, GEE has demonstrated a track record of successfully integrating nine acquisitions, and we expect it to continue with EMC.
>
> . . .
>
> Before turning the call over to Mike, I want to highlight at [sic] few key statistics about our Company post the acquisition of EMC. First of all, we continue to see solid growth rates in the aviation market, with the in-flight connectivity market growing in the 20% range and content in the 8% to 10% range annually. We expect the Maritime market to grow at a rate of 10% to 15% per year.
>
> Our combined Company's full year 2016 pro forma revenue is forecast to exceed $660 million, and adjusted EBITDA on a full year pro forma basis is expected to approximately double. Our Content segment, which had traditionally been 70% of our revenue, will now represent about 50% of the combined Company revenue. Our Connectivity business will be split approximately equally between aviation and maritime at about 40% each, and the remainder coming from land-based markets. And we have only one customer which represents over 5% of our revenue.
>
> To best align our work structure with our new end markets we organized GEE along three service lines, media and content, aviation, and maritime and land. These groups are being led by Wale Adepoju, Josh Marks and Abel Avellan respectively, all three are on the call to answer questions during the Q&A portion. As previously mentioned, we expect to derive $15 million of synergy's [sic] in 2017 and at least $40 million of annual synergy's in 2018 and beyond. A major source of saving is expected to come from network efficiencies including the ability to optimize bandwidth costs through a consolidation of existing network assets including space segment and ground infrastructure, as well as better capacity utilization.

47. Plaintiffs, analysts, and other investors in Global Eagle heard Davis' statement about Global Eagle being "on track" in conjunction with the other statements he made during the opening portion of the August Earnings Call, which conveyed a

specific description of how the combined companies would operate when fully integrated. In particular, Davis explained that the combined companies would net $15 million in savings in 2017 and at least $40 million in savings by 2018. Davis also explained that revenue from the combined companies would exceed $660 million in 2016. Davis further explained that the Content segment within the combined companies would be responsible for 50% of revenue (down from 70%) and that the Connectivity segment would be split equally between aviation and maritime. Davis' statements provided the public with a concrete understanding as to how the combined companies would operate and the benefits that would be obtained once the integration process was complete. Consequently, when Davis told investors that Global Eagle was "on track," investors understood this statement to mean that Global Eagle had made measurable, verifiable progress towards realizing the benefits of the EMC acquisition.

48. Analyst reports confirm that the public relied upon Davis' statement in this regard. For example, Lake Street Capital, a well-known investment research firm, emphasized the importance of Defendants' statements concerning EMC in relation to the Company's overall performance. On August 9, 2016, Lake Street analysts told investors that the Company's overall "soft" second quarter performance was "overshadowed" by the positive prospects of the EMC acquisition. Specifically, Lake Street stated that, "management sees as much as $15M in incremental EBITDA in 2017 and $40M by 2018 with cost synergies" and that EMC was so important to Global Eagle that it would "considerably change the [C]ompany's mix of business from 2/3 content and 1/3 connectivity to a 50/50 mix . . . ."

49. Davis' statement that Global Eagle's integration with EMC was "on track" was false and/or materially misleading. Subsequent disclosures by Global Eagle prove that the Company was in fact not "on track" in terms of integrating EMC at the time Davis made this statement. On November 8, 2016, Davis revealed during an investor conference call that Global Eagle was "slightly behind in terms of timing and recognizing the benefits

[of the synergies] in 2016." During the same call, Severson told investors that the "2016 EMC transaction synergies [were] not going to be executed as quickly as originally expected ruing the second half of 2016." Severson also attributed the Company's decision to lower its EBITDA estimates, in significant part, to Global Eagle's "synergy execution" (accounting for $6 million of the $20 million to $25 million reduction). Severson's comments were also published in a press release by Global Eagle issued earlier in the day, explaining that Global Eagle's decision to revise EBITDA was due in part to "slower than originally estimated execution of EMC Acquisition synergies."

50. Davis, in addition to being wrong, had no reasonable factual basis for telling the public that Global Eagle was "on track" in terms of integrating the companies. In a prospectus filed with the SEC on October 11, 2016, Global Eagle revealed that its acquisition of EMC had "occupied significant amounts of [the Company's] personnel who [were] also responsible for the performance of important controls" and that "[d]ue to [the Company's] focus on this transaction and the lack of sufficient qualified resources, [the Company] failed to execute certain control and monitoring activities timely . . . ." "[D]uring the third quarter of 2016," Global Eagle stated, "[the Company] identified an additional material weakness in [its] control activities, monitoring, and information and communication systems." These internal control problems prevented Global Eagle, and Davis in particular, from accurately tracking the Company's progress in terms of integrating Global Eagle with EMC.

51. Information obtained from former employees of the Company confirm that Global Eagle's internal control problems interfered with its ability to oversee the integration process. CW1, in particular, stated that there was an internal concern regarding the acquisition of EMC, the lack of staff available to deal with the acquisition, and the integration of financial systems. According to CW1, there was a lack of full comprehension regarding how to integrate and streamline EMC. CW1 revealed that there was not a full compliance team when it came to the acquisition of EMC and that "a lot of

things were done haphazardly and at the last minute." CW2, who began working at Global Eagle in May 2016, stated that during CW2's time at Global Eagle, the integration of EMC went poorly and that Global Eagle had problems integrating EMC.

52. Despite representing to the public that Global Eagle's integration efforts were "on track," they were not. Moreover, Davis had no basis for making these statements, given that the supporting information was either not available or unverified due to the Company's ongoing internal control deficiencies. Davis omitted this information from his statement and did not inform investors that Global Eagle's internal controls in this regard were deficient. Had investors known this, they would have been better able to assess Davis' statement about Global Eagle's progress in terms of integrating EMC.

53. The importance of the EMC acquisition was paramount. Accordingly, the truth about Global Eagle's progress towards integrating the two companies was material.

## B. Defendants materially misrepresented Global Eagle's expected synergies and revenue from the EMC acquisition.

*July 27, 2016 Press Release*

54. On July 27, 2016, the Company issued a press release, also attached as Exhibit 99.1 to the Form 8-K filed with the SEC ("July 27, 2016 Form 8-K"), announcing that Global Eagle had completed its previously announced acquisition of EMC. Global Eagle, in the July 27, 2016 Form 8-K, stated the following with regards to the Company's completed acquisition of EMC:

> GEE has a successful track record of integrating acquisitions and achieving synergies. **With EMC, the Company expects to realize synergies of $15 million in 2017, growing to $40 million in 2018 and thereafter.** A major source of savings is expected to come from network efficiencies, including the ability to optimize bandwidth costs through a consolidation of existing network assets, including space segment and ground infrastructure, as well as better capacity utilization. Savings are also expected through reductions in SG&A spending and the consolidation of facilities.

> In addition to cost savings, GEE expects the combination to generate significant revenue synergies. Driving sales of GEE's media, software, advertising and operations solutions products in the underserved maritime market are a key objective of the Company. GEE's digital media team has had a long-term relationship with EMC and expects to launch new products to major cruise lines before year-end. EMC's proprietary technologies are in use today to improve the connectivity experience and optimize bandwidth usage in the maritime market. GEE will soon introduce these technologies into the aviation market.

55. The above statements in bold were materially misleading because Global Eagle lacked the internal controls and personnel to issue any type of estimates or guidance related to its acquisition of EMC. According to CW1, Global Eagle did not do any independent studies to determine what the actual synergies and future guidance would be. As revealed by Global Eagle in its October 11, 2016 prospectus, Global Eagle "failed to execute certain control and monitoring activities timely, and at a sufficient level of precision to address the risk of material misstatement to our financial statements." Given that Global Eagle could not address the risk of a material misstatement to its financials, Global Eagle should not have been issuing guidance. In fact, on February 21, 2017, Global Eagle subsequently withdrew its guidance for fiscal 2017 & 2018, stating that investors "should no longer rely upon any previous estimates that we have made."

56. The above statements were material because investors considered them in connection with their decisions to purchase and/or sell Global Eagle stock. Indeed, analysts placed significant weight on Global Eagle's prospects surrounding the acquisition of EMC. For example, in an analyst report from investment research firm Evercore ISI, dated August 3, 2016, analysts noted that the acquisition of EMC had closed, and that "[Evercore] remain[s] proponents of the EMC acquisition as the maritime market will provide a substantial distribution platform for ENT's content, while leading to meaningful synergies by combining the company's satellite infrastructure. We look forward to further financial detail in the print to fully integrate the company into our model." Evercore's

reliance on Defendants' statements concerning the acquisition of EMC confirms that Defendants' statements were material, specific, and influential within the public markets.

*August 8, 2016 Earnings Call*

57. On August 8, 2016, after trading hours, Global Eagle had an earnings call to discuss the second quarter results and the acquisition of EMC ("August Earnings Call"). Global Eagle stated in pertinent part:

> **[Dave Davis]**
>
> As a combined company, GEE's revenue base is now better diversified and split equally between media content and connectivity sale. The integration process is well underway, and we expect to realize significant cost savings from this acquisition. We are on track for $15 million in savings in 2017, **growing to at least $40 million in 2018 and thereafter.** Over the past three years, GEE has demonstrated a track record of successfully integrating nine acquisitions, and we expect it to continue with EMC.
>
> **[Michael Zemetra]**
>
> Turning to guidance. **Including the impact of the EMC acquisition on our last five months of 2016, we are updating our full-year 2016 guidance as follows. 2016 full-year revenue of $545 million to $575 million, 2016 full-year adjusted EBITDA got $80 million to $92 million.** 2016 full-year CapEx range from 40 million to 45 million, which included expected growth investment in connectivity equipment.

58. The above statements were materially misleading because Global Eagle was in no position to give guidance or estimates of savings from the EMC acquisition. As explained previously, according to CW1, Global Eagle did not do any independent studies to determine what the actual synergies and future guidance would be. Further, as revealed by Global Eagle in its October 11, 2016 prospectus, Global Eagle "failed to execute certain control and monitoring activities timely, and at a sufficient level of precision to address the risk of material misstatement to our financial statements." Given that Global Eagle

could not address the risk of a material misstatement to its financials, Global Eagle should not have been issuing guidance. In fact, on February 21, 2017, Global Eagle subsequently withdrew its guidance for fiscal 2017 & 2018, stating that investors "should no longer rely upon any previous estimates that we have made."

59. The truth about Global Eagle's internal controls over financial reporting is material because investors would have certainly considered it when deciding whether to invest in the Company. Further, the misleading statements were material because investors considered them in connection with their decisions to purchase and/or sell Global Eagle stock.

60. Analysts again placed significant weight on Defendants' statements concerning EMC. Piper Jaffray, on August 9, 2016, reiterated Defendants' statements about EMC to the general public, stating that "[t]he company also provided 2H16 revenue and EBITDA guidance for their recently acquired EMC business with midpoint of $80M and $25M, respectively." Piper Jaffray's reliance on Defendants' statements concerning EMC confirm that the statements were material to the public in general.

61. Further, Lake Street Capital ("Lake Street"), a well-known investment research firm, emphasized the importance of Defendants' statements concerning EMC in relation to the Company's overall performance. On August 9, 2016, following Global Eagle's August 8, 2016 investor conference call, Lake Street analysts told investors that the Company's overall "soft" second quarter performance was "overshadowed" by the positive prospects of the EMC acquisition. Specifically, Lake Street reiterated that "[m]anagement expects this segment to come back with a strong 2nd half and reiterated guidance for the year on a pro-forma basis excluding the effects of the EMC acquisition." Lake Street stated further that, EMC was so important to Global Eagle that it would "considerably change the [C]ompany's mix of business from 2/3 content and 1/3 connectivity to a 50/50 mix, without modeling any significant international carrier wins which could accelerate growth." Lake Street's analysis of Defendants' statements

concerning the EMC acquisition, like the comments made by Evercore and Piper Jaffray, show that Defendants' statements were material and influential in the marketplace.

62. The above misstatements were material and artificially inflated Global Eagle's stock price. As a result, investors were misled to purchase Global Eagle stock at artificially inflated prices.

*November 8, 2016 Press Release*

63. On November 8, 2016, after the market closed, Global Eagle issued a press release, also attached as Exhibit 99.1 to a Form 8-K filed with the SEC ("November 8, 2016 Press Release") announcing the Company's financial and operating results for the third fiscal quarter ended September 30, 2016. The Press Release stated in pertinent part:

> **Business Outlook**
>
> "While we have had a few setbacks with the loss of one of the American Airlines contracts and delays in our plans to install three large maritime customers, we are well-positioned to realize healthy revenue and Adjusted EBITDA growth as we enter into 2017. **For our fourth quarter 2016, we are projecting our Adjusted EBITDA to be between $23 million and $27 million."** said Tom Severson, CFO at GEE. "The integration of the EMC business and our detailed synergy plan is well underway. **We have identified at least $40 million in annual run-rate synergies that we plan to have substantially completed by early 2018."**
>
> **2016 Guidance:**
>
> GEE is now updating its full-year 2016 guidance. The new full-year guidance is as follows:
>
> - Full year 2016 Revenue of $530-538 million
> - **Full year 2016 Adjusted EBITDA⁺ of $61-65 million**
> - **Fourth quarter 2016 Adjusted EBITDA⁺ of $23-27 million**
> - **Full year 2016 capital expenditures in the range of $45-50 million**

November 8, 2016 Press Release.

64. The statements above relating to the EMC synergies and earnings estimates continued to materially mislead investors. Prior to the above misstatements, Global Eagle revealed that it did not have adequate internal controls to determine whether Global Eagle's financials contained a material misstatement. Accordingly, Global Eagle had no reasonable basis for making estimates with unverified information. Thus, the above statements relating to guidance and estimates are misleading because Global Eagle could not reasonably issue forecasts but did so anyway. As a result, on February 21, 2017, Global Eagle was forced to tell investors not to rely on any of their prior estimates.

65. At the same time the November 8, 2016 Press Release, revealed to investors that it was reducing its 2016 Adjusted EBITDA estimates. Global Eagle stated as follows:

> *2016 Adjusted EBITDA revision factors*: 1) Revenue items mentioned above, 2) **slower than originally estimated execution of EMC Acquisition synergies** and 3) $4 million in EMC Acquisition satellite capacity discounts which were initially expected to be realized post acquisition closing but were instead required to be recorded as an element of purchase accounting and in the day one EMC opening balance sheet. Total Adjusted EBITDA impact is an approximate $20 million loss versus our guidance provided in August of 2016.

66. These statements partially revealed to investors that Global Eagle was struggling to integrate EMC and as a result would not see the previously reported $15 million in synergy estimates. For example, the company revealed that it was lowering Adjusted EBITDA based on slower than anticipated execution of the EMC acquisition synergies partially revealing that Global Eagle was purely speculating on its estimates. According to CW1, Global Eagle did not do any independent studies to determine what the actual synergies and future guidance would be. In reality, Global Eagle would later be forced to admit that its previous estimates were unreliable and that investors should ignore all previous issued estimates.

67. Analysts and investors alike interpreted this news poorly. Lake Street issued an analyst report on November 9, 2016, stating that "EBITDA was further affected by slower than expected execution on EMC synergies and the loss of an expected satellite discount from the EMC acquisition. We have significantly lowered our EBITDA expectations for 2017 accordingly." Lake Forest elaborated stating that "Global Eagle reported a very weak Q3 and lowered 2016 guidance by a material amount as well. The weakness in both revenues and EBITDA was attributed to a number of issues ranging from the loss of a significant content contract with American Airlines, delays in 3 major maritime installations, slower execution on EMC synergies, and the loss of an expected satellite capacity discount from the EMC acquisition." Lake Street called the announcement "a disappointing start to the combination with EMC . . . ."

68. Despite the announcement of a major joint venture agreement with Shareco, as a result of the above referenced revelations on November 8, 2016, Global Eagle stock declined from $8.15 at open on November 9, 2016, to $7.17 at close on November 9, 2016, a decline of approximately 12%, on unusually heavy volume.

*November 8, 2016 Earnings Call*

69. On November 8, 2016 after trading hours, Global Eagle had an earnings call to discuss the third quarter results and the acquisition of EMC ("November Earnings Call"). Dave Davis and Tom Severson stated in pertinent part:

> **[Davis]**
>
> Let me move on now to our integration with EMC. As you know we closed the EMC transaction during the third quarter and we are moving forward with the integration of our companies. So far the integration is going well and it has provided GE with a number of significant, strategic and financial benefits. Through EMC proprietary technologies coupled with our combined scale network coverage and network operations we've been able to strengthen our offerings to our customers. Our recent activation with Avianca Brasil and multiple-maritime content and digital media wins are related to our acquisition with EMC.

While we now believe our original synergy estimates may prove to be conservative. We are slightly behind in terms of timing and recognizing the benefits in 2016. Our new synergy estimates are forecast above plan to do better network efficiencies and increased labor and non-labor savings.

We've already consolidated network ops, network products finance and HR functions under one organization. We've also already signed an agreement with Intelsat to receive C- and Ku- band services on eight satellites resulting in significant cost savings on a per megahertz basis.

**[Severson]**

Now moving on to guidance, we are revising our full year guidance. **Full year 2016 revenues are expected to be in the range of $530 million to $538 million. Full year 2016 adjusted EBITDA is expected to be in the range of $61 million to $65 million. Fourth quarter 2016 adjusted EBITDA is expected to be between $23 million and $27 million.**

* * *

Our downward revision of 2016 adjusted EBITDA guidance versus our prior guidance relates to a few items as well. First, the items impacting 2016 revenue just described resulted in approximately $10 million of 2016 adjusted EBITDA difference. Secondly, 2016 EMC transaction synergies are not going to be executed as quickly as originally expected during the second half of 2016.

This said, the management teams with the assistance our consulting firm, [indiscernible] **have identified at least $40 million of annual run rate synergies which respect to be fully implemented by early 2018**. Finally**,** the EBITDA guidance is also being negatively impacted by approximately $4 million in EMC related satellite capacity discounts which were initially expected to be realized post closing but we instead required to be reported as an element of purchase accounting and are included in the EMC opening balance sheet.

So in summary, the third quarter was challenging as we begin the integration of a very significant acquisition for Global Eagle. With the management teams working together for a few months now, we feel well position to realize healthy revenue and EBITDA growth of 2017 and now have a clear path to

> thoughtfully execute transaction synergies as we realized a many other benefits from this combination.

November Earnings Call.

70. The statements above reiterated the materially false and misleading statements issued in the November 8, 2016 Press Release and were materially misleading for the same reasons. Further, the statements above also reiterated the corrective disclosures in the November 8, 2016 Press Release.

*February 21, 2017 Press Release*

71. Before the market opened on February 21, 2017, Global Eagle issued a press release ("February 21, 2017 Press Release"), attached to a Form 8-K filed with the SEC on the same day, announcing the sudden departure of Defendant Davis as CEO and Defendant Severson as CFO, both "resigning" effective February 20, 2017. Additionally, the Company also disclosed that it would be late in filing its Form 10-K for the fiscal quarter and year-ended December 31, 2016, as well as disclosing that it had material weaknesses in internal controls over its financial reporting. The February 21, 2017 Press Release stated, in part:

> Dave Davis resigned as a Board Director and as CEO effective February 20, 2017 to pursue other endeavors. He will continue to support the Company as a consultant during a transition period.
>
> * * *
>
> The Company also announced that Tom Severson, Executive Vice President & Chief Financial Officer, resigned, effective February 20, 2017. The Board has initiated a CFO search to consider candidates for the position. In the interim, Mr. Leddy will serve as the Company's principal financial officer.
>
> **10-K Filing Update**
>
> Global Eagle expects to file its Annual Report on Form 10-K for the fiscal year ended December 31, 2016 after the March 16, 2017 U.S. Securities and Exchange Commission deadline. The Company requires additional time to

> file its Annual Report given its increased size and complexity after the Emerging Markets Communications acquisition and the effect of that size and complexity on its financial reporting processes, its need to transition the finance department after the prior CFO's departure and its need to complete additional financial-closing procedures associated with the Company's material weaknesses in internal control over its financial reporting.
>
> * * *
>
> Other than full-year 2016 revenue, we are not providing any other estimates of our financial performance (including, without limitation, Adjusted EBITDA) for the fourth quarter or full year 2016, and **investors should no longer rely upon any previous estimates that we have made.** In addition to the completion of our financial closing procedures and the procedures and audit to be conducted by our auditors, factors that could cause actual results to differ from those described above are set forth below under "Cautionary Note Concerning Forward-Looking Statements." Accordingly, you should not place undue reliance upon our preliminary estimates.

(February 21, 2017 Press Release.)

72. The above statements in bold revealed to the market that the prior statements related to synergy and earnings estimates were false and should not be relied upon.

73. This information was highly material to analysts and investors. As Wells Fargo noted in an Equity Research Report dated February 21, 2017, "[i]t is unclear to us why these significant changes are being made right now, but we believe this is a negative for the stock. The company has been in the middle of a major transformation with the recent acquisition of EMC and multipart investment from Chinese partner Beijing Shareco. Dave Davis was the architect of the current Global Eagle so his departure is concerning. Also concerning, Severson was only appointed to the CFO position in August."

74. As a result of the revelations, Global Eagle stock declined from $6.22 at close on February 17, 2017, to $4.48 at close on February 21, 2017, a decline of almost 28%.

## C. Defendants Made Materially False and Misleading Statements And Omissions about how the EMC Acquisition Affected Global Eagle's Internal Controls

*August 9, 2016 Form 10-Q*

75. On August 9, 2016, Global Eagle filed a Form 10-Q with the SEC announcing the second fiscal quarter 2016 results for the quarter ended June 30, 2016 ("August Form 10-Q"). The August 8, 2016 Form 8-K touted the success and the progress the Company was having with the Emerging Marketing acquisition, stating in relevant part:

> **Changes in Internal Control over Financial Reporting**
>
> We are in the process of implementing changes, as more fully described in our 2015 Form 10-K, to the Company's internal control over financial reporting to remediate the material weakness as described in our 2015 Form 10-K. Other than such changes, **there have been no changes in our internal control over financial reporting during the three months ended June 30, 2016, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.**

August Form 10-Q, p. 56

76. The above statement was materially false or misleading because Defendants later admitted on October 11, 2016, that "during the first half of 2016, we did not sufficiently focus on assessing the risks of material misstatement and implementing effective transaction level controls at WOI for purposes of our assessment of internal control over financial reporting as of December 31, 2016." Therefore, the statements above were false because despite Defendants statements, prior to August 9, 2016, there was a change in internal controls that materially affected the reporting.

77. Further Defendants omitted significant information concerning the Company's internal financial controls. Specifically, the above statements failed to disclose material information concerning the design and operating effectiveness of three COSO components relating to control activities, monitoring activities and information and communication; and accounting for income taxes, and also that Global Eagle had

inadequate internal controls over financial reporting in the areas of revenues, license-fee expenses, inventory, internally developed software, goodwill impairment and accounting for business combinations, as well as at the entity level affecting two COSO components relating to control environment and risk assessment. This omission rendered the above statements false and misleading because investors believed at this time that Global Eagle was able to issue statements about its financials without material false information.

78. The truth about Global Eagle's internal controls over financial reporting is material because investors would have certainly considered it when deciding whether to invest in the Company. Further, the misleading statements were material because investors considered them in connection with their decisions to purchase and/or sell Global Eagle stock.

79. In conjunction with the August Form 10-Q, Defendants Davis submitted a certification concerning the Company's internal controls. The certification was submitted in accordance with the Sarbanes-Oxley Act of 2002 and represented as follows:

> I, Dave M. Davis, certify that:
>
> 1. I have reviewed this Quarterly Report on Form 10-Q of Global Eagle Entertainment Inc.
>
> 2. **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statement made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;**
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

**(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and**

5. **The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):**

**(a) All significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are**

> **reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and**
>
> **(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.**

80. The bold-faced statements above were materially false and/or misleading because as stated by the confidential witnesses, Davis knew at the time that he was making misleading statements about the state of Global Eagle's internal controls.

81. The above misstatements were material and artificially inflated Global Eagle's stock price. As a result, investors were misled to purchase Global Eagle stock at artificially inflated prices.

*<u>August 24, 2016 Press Release</u>*

82. On August 24, 2016, after the market closed, Global Eagle issued a press release announcing the departure of CFO Michael Zemetra, and the appointment of Tom Severson as Executive Vice President and Chief Financial Officer.

83. This was the first indication to the market that Global Eagle was struggling with the acquisition of EMC and had significant material issues with their internal controls. According to the confidential witnesses, Zemetra was not let go to pursue other opportunities, but was actually let go due to a disagreement over the financial state of the Company. After confronting Davis, Zemetra was forced to resign.

84. As a result of this revelation, after hours on August 24, 2016, Global Eagle stock declined from $8.69 at close on August 24, 2016, to $8.04 at close on August 26, 2016, a decline of approximately 7.4% over two trading days.

*<u>October 10, 2016 Prospectus</u>*

85. On October 10, 2016, after the market closed, Global Eagle filed a Form S-3 Registration Statement with the SEC ("Registration Statement"). Within the Registration

Statement, Defendants made misrepresentations about the Company's current state of internal controls. The Registration Statement stated in pertinent part:

> We identified a material weakness in our internal control over financial reporting as of December 31, 2015 relating to resources and the timeliness of our financial statement close process, as reported in our Annual Report on Form 10-K for the year ended December 31, 2015 filed with the SEC on March 17, 2016 (the "2015 Form 10-K"). In 2016, we have identified an additional material weakness in the areas of the design and operating effectiveness of control and monitoring activities, and the quality of information used in the operation of our financial controls. If we are unable to remediate these material weaknesses and maintain effective internal control over financial reporting, the accuracy and timeliness of our financial reporting may be adversely affected.
>
> Maintaining effective internal control over financial reporting is necessary for us to produce reliable financial statements. A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of annual or interim financial statements will not be prevented or detected on a timely basis. We identified a material weakness in our internal control over financial reporting as of December 31, 2015 relating to resources and the timeliness of our financial statement close process, as reported in our 2015 Form 10-K. As of December 31, 2015, our assessment of internal control over financial reporting did not include the internal control over Western Outdoor Interactive Private Limited ("WOI"), which had been acquired during 2015. During the first half of 2016, we did not sufficiently focus on assessing the risks of material misstatement and implementing effective transaction level controls at WOI for purposes of our assessment of internal control over financial reporting as of December 31, 2016. Also, during the third quarter of 2016, we consummated a large business combination which occupied significant amounts of our personnel who are also responsible for the performance of important controls. Due to our focus on this transaction and the lack of sufficient qualified resources, we failed to execute certain control and monitoring activities timely, and at a sufficient level of precision to address the risk of material misstatement to our financial statements. Also, we did not appropriately test the completeness and accuracy of information used in the performance of these control and monitoring activities. As a result,

> during the third quarter of 2016, we identified an additional material weakness in our control activities, monitoring, and information and communication systems. Specifically, our management determined that we do not have effective internal controls related to (i) the design of controls with the appropriate precision and responsiveness to address risks relating to the accuracy of financial information being reported by WOI, (ii) **the design of controls to validate the completeness and accuracy of underlying data used in the performance of controls over accounting transactions and disclosures**, **(iii) the timely and effective implementation of our controls, including evidence of operating effectiveness, and (iv) effective monitoring of our controls.**

Registration Statement, p. 7.

86. The bolded statements above were materially false and/or misleading because they omitted significant information concerning the Company's internal financial controls. Specifically, the above statements failed to disclose material information that Global Eagle had inadequate internal controls over financial reporting in the areas of revenues, license-fee expenses, inventory, internally developed software, goodwill impairment and accounting for business combinations, as well as at the entity level affecting two COSO components relating to control environment and risk assessment. This omission rendered the above statements false and misleading because investors believed at this time that Global Eagle was able to issue statements about its financials without material false information.

87. The statements above also revealed to the market that Global Eagle could not "address the risk of material misstatement to our financial statements" and that "there is a reasonable possibility that a material misstatement of annual or interim financial statements will not be prevented or detected on a timely basis." This partially revealed to the market that Defendants could not reasonably make projections.

88. Further, the above statement revealed that Global Eagle's August 9, 2016 statement was false because "[d]uring the first half of 2016, we did not sufficiently focus on assessing the risks of material misstatement and implementing effective transaction

level controls at WOI for purposes of our assessment of internal control over financial reporting as of December 31, 2016."

89. As a result of the revelations after hours on October 10, 2016, Global Eagle stock declined from $9.50 at close on October 10, 2016, to $8.85 at close on October 12, 2016, a decline of approximately 6.8% over just two trading days.

*November 9, 2016 Form 10-Q*

90. On November 9, 2016, Global Eagle filed a Form 10-Q with the SEC announcing the third fiscal quarter 2016 results for the quarter ended September 30, 2016 ("November Form 10-Q"). The November Form 10-Q revealed to investors additional material weaknesses in Global Eagle's internal controls in addition to those mentioned on October 10, 2016. Tom Severson signed the November 9, 2016 Form 10-Q that stated that in addition to the previous disclosed material weakness in internal controls, "during the quarter ended September 30, 2016, **we identified a material weakness in our internal controls over financial reporting related to our accounting for income taxes."** (November 9, 2016 Form 10-Q, p. 67.)

91. The bolded statement above were also materially false and/or misleading because they omitted significant information concerning the Company's internal financial controls. Specifically, the above statements failed to disclose material information concerning the areas of revenues, license-fee expenses, inventory, internally developed software, goodwill impairment and accounting for business combinations, as well as at the entity level affecting two COSO components relating to control environment and risk assessment. Further, the above statements failed to inform investors that their internal controls were so bad that they could not adequately issue estimates or guidance.

92. The truth about Global Eagle's internal controls over financial reporting is material because investors would have certainly considered it when deciding whether to invest in the Company. Further, the misleading statements were material because investors

considered them in connection with their decisions to purchase and/or sell Global Eagle stock.

93. In conjunction with the November Form 10-Q, Defendants Davis submitted a certification concerning the Company's internal controls. The certification was submitted in accordance with the Sarbanes-Oxley Act of 2002 and represented as follows:

> I, Dave M. Davis, certify that:
>
> 1. I have reviewed this Quarterly Report on Form 10-Q of Global Eagle Entertainment Inc.
>
> 2. **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statement made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;**
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
> > (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
> >
> > (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our

> supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
>
> (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
>
> **(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and**
>
> 5. **The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):**
>
> **(a) All significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and**
>
> **(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.**

94. Severson also submitted certifications concerning the Company's internal controls in conjunction with the August Form 10-Q. The certification was submitted in accordance with the Sarbanes-Oxley Act of 2002 and represented as follows:

> I, Tom Severson, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q of Global Eagle Entertainment Inc.

2. **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statement made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;**

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

**(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and**

5. **The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):**

**(a) All significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and**

**(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.**

95. The bold-faced statements above were materially false and/or misleading because Davis and Severson knew at the time that they were making misleading statements about the internal controls of Global Eagle and its ability to issues guidance.

96. The statements above also partially revealed the true state of Global Eagles internal controls.

97. As a result of the revelations after hours on November 9, 2016, Global Eagle stock declined from $7.24 at open on November 10, 2016, to $6.84 at close on November 14, 2016, a decline of approximately 5.5% over three trading days.

*March 13, 2017 Form 8-K*

98. After the closed on March 13, 2017, Global Eagle filed a Form 8-K with the SEC announcing the resignation of yet another high ranking accountant, Frank Mullen, Senior Vice President & Chief Accounting Officer of Global Eagle, with his last day of

employment expected to be April 14, 2017. This was Global Eagle's fourth departure of a highly ranked executive and accounting officer in just seven months and three departures within the last month.

99. The departure of yet another senior executive further signaled to the market the dire material weaknesses of Global Eagle's internal control beyond what had previously been stated by the Company.

100. On this news Global Eagle stock dropped from $4.42 at the open of March 14, 2017, to close at $4.19, a change of over 5%. Even with the departure of another senior executive, the complete truth of the true nature of material weaknesses in internal controls was still not revealed.

*March 16, 2017 Form NT-10K*

101. On March 16, 2017, after the market closed, Global Eagle filed a Form NT 10-K ("Form NT 10-K") announcing the Company's inability to file its Annual Report on Form 10-K for the fiscal year ended December 31, 2016 (the "2016 Form 10-K") within the prescribed time period. The Company also disclosed for the first time "additional material weaknesses in internal control." The Form NT 10-K was signed by new CEO Jeffrey Leddy, and stated in pertinent part:

> Global Eagle Entertainment Inc. (the "Company") is unable to file its Annual Report on Form 10-K for the fiscal year ended December 31, 2016 (the "2016 Form 10-K") within the prescribed time period. The Company requires additional time to file the 2016 Form 10-K due to: the Company's increased size and complexity following its acquisition of Emerging Markets Communications in July 2016, and the effect of that increased size and complexity on its financial reporting processes; the Company's need to transition its finance function after the recent departures of its Chief Executive Officer and Chief Financial Officer and during the pending departure of its Chief Accounting Officer; and the Company's need to complete additional financial-closing procedures associated with its material weaknesses in internal control over financial reporting.

The Company previously disclosed in its Annual Report on Form 10-K for the fiscal year ended December 31, 2015 that it had a material weakness in internal control over financial reporting relating to its lack of a sufficient number of personnel to execute a timely financial close and to properly accumulate certain analyses and reconciliations consistently and in a timely and accurate manner. The Company also previously disclosed in its Quarterly Report on Form 10-Q for the quarter ended September 30, 2016 that it had additional material weaknesses in internal control over financial reporting in the areas of: the design and operating effectiveness of three Committee of Sponsoring Organizations of the Treadway Commission ("COSO") components relating to control activities, monitoring activities and information and communication; and accounting for income taxes.

Although the Company has not yet completed its assessment of the effectiveness of its internal control over financial reporting as of December 31, 2016, the Company expects that it will disclose in the 2016 Form 10-K that the Company's disclosure controls and procedures and internal control over financial reporting were not effective as of December 31, 2016 due to: (i) material weaknesses that the Company previously reported but has not yet fully remedied; and (ii) **additional material weaknesses in internal control over financial reporting in the areas of revenues, license-fee expenses, inventory, internally developed software, goodwill impairment and accounting for business combinations, as well as at the entity level affecting two COSO components relating to control environment and risk assessment**. The Company discovered these additional material weaknesses while preparing its financial statements for the fiscal year ended December 31, 2016. The Company is endeavoring to rectify its material weaknesses and to complete all work necessary to file the 2016 Form 10-K as promptly as practicable. Based on its work to date, the Company expects that it will be necessary to implement additional internal controls and procedures and take other remedial actions relating to its material weaknesses before it can finalize and file its 2016 Form 10-K. This process could require substantial time and resources, and the Company's ongoing review may identify additional material weaknesses or other issues that it must address prior to finalizing the 2016 Form 10-K.

Although the Company is diligently addressing the issues described above, it does not expect to file the 2016 Form 10-K within the time period specified in Rule 12b-25.

Form NT 10-K.

102. The above bolded statements finally revealed the truth to the market and investors. Specifically, that not only were internal controls inadequate relating to its lack of a sufficient number of personnel and the design and operating effectiveness of three COSO components relating to control activities, monitoring activities and information and communication; and accounting for income taxes, but also that Global Eagle had inadequate internal controls over financial reporting in the areas of revenues, license-fee expenses, inventory, internally developed software, goodwill impairment and accounting for business combinations, as well as at the entity level affecting two COSO components relating to control environment and risk assessment.

103. This revealed to investors the true state of the dire state of internal controls at Global Eagle.

104. On this news, Global Eagle stock dropped from a close of $4.09 on March 16, 2017, to $3.50 at close on March 17, 2017, a 14.42% decline.

**D. Post Class Period Statements**

105. After the Class Period, Global Eagle made multiple relevant and material announcements that directly affect this litigation.

*April 21, 2017 Form 8-K*

106. On April 21, 2017, Global Eagle filed a Form 8-K with the SEC ("Form 8-K"), indicating that on April 18, 2017, Abel Avellan, the former CEO of EMC, delivered notice of his voluntary resignation as the President & Chief Strategy Officer of Global Eagle. Global Eagle stated that Mr. Avellan's employment with the Company terminated on that same day.

107. As stated in the scienter section below, this abrupt resignation of the former CEO of EMC was highly suspicious and indicative of scienter.

*May 11, 2017 Form NT 10-Q*

108. On May 11, 2017, Global Eagle filed a Form NT 10-Q with the SEC ("Form NT 10-Q"), indicating that the Company's Form 10-Q for the quarter ended March 31, 2017 (Q1 2017 Form 10-Q) could not be filed within the prescribed time period. Global Eagle stated that the reason they could not timely file their Q1 2017 Form 10-Q was because the Q1 2017 Form 10-Q must include information from the still not filed Form NT 10-K. The Form NT 10-Q was signed by new CFO Paul Rainey. The Company stated in pertinent part:

> The Company will file the 2016 Form 10-K and Q1 2017 Form 10-Q as promptly as practicable. However, **the Company must implement additional internal controls and procedures and take other remedial actions relating to its material weaknesses before it can finalize and file these reports.** This process could require substantial time and resources, and the Company may identify material weaknesses in addition to those previously disclosed that it would have to address prior to finalizing these reports.
>
> * * *
>
> The Company expects that the Q1 2017 Form 10-Q will reflect significant changes in its results of operations due to the Company's acquisition of Emerging Markets Communications in July 2016 and the inclusion of that business in the Company's financial performance for the quarter ended March 31, 2017. For the reasons described in Part III above, **the Company cannot make a reasonable estimate of its results of operations for the first quarter of 2017, including its net income (loss) for this period.**

Form NT 10-Q.

109. The above statements in bold reiterated to the market the dire state of the internal controls and that the Company did not have the ability to issue guidance or estimates to the market. Although this information was already disseminated to the market, it emphasizes the magnitude of the internal control problems.

*May 31, 2017 Form 8-K*

110. On May 31, 2017, Global Eagle filed a Form 8-K with the SEC ("May 31, 2017 Form 8-K") after the market had closed. The May 31, 2017 Form 8-K provided investors an update on selected financial information of the Company. The May 31, 2017 Form 8-K was signed by new CEO Paul Rainy and stated in pertinent part:

> The Company expects its fourth quarter 2016 Adjusted EBITDA to be between $13-18 million.
>
> * * *
>
> The updated fourth-quarter 2016 Adjusted EBITDA guidance above is lower than our prior guidance **due in significant part to accounting policy adjustments.** In many cases these policy adjustments negatively affected our Adjusted EBITDA calculation but did not materially affect our cash flows for the period.
>
> * * *
>
> Adjusted EBITDA is one of the primary measures used by our management and board of directors to understand and evaluate our financial performance and operating trends, including period to period comparisons, to prepare and approve our annual budget and to develop short and long term operational plans. Additionally, **Adjusted EBITDA is one of the primary measures used by the compensation committee of our board of directors to establish the funding targets for our annual bonus pool for our employees and executives.** We believe our presentation of Adjusted EBITDA is useful to investors both because it allows for greater transparency with respect to key metrics used by management in its financial and operational decision-making and our management frequently uses it in discussions with investors, commercial bankers, securities analysts and other users of our financial statements.

May 31, 2017 Form 8-K, p. 1-2

111. The above post-class period statements indicated to investors how far off previous synergy guidance and estimates had been. Further, Global Eagle revealed that its previous accounting policy resulted in an inflated Adjusted EBITDA. This information is material and shows that the lack of internal controls during the Class Period inflated the

Company's Adjusted EBITDA resulting in higher annual bonus pools for the employees and executives.

*August 11, 2017 Form NT 10-Q*

112. On August 11, 2017, Global Eagle filed a Form NT 10-Q with the SEC ("August 11, 2017 Form NT 10-Q") after the market had closed. The August 11, 2017 Form NT 10-Q was deemed filed on August 14, 2017. The August 11, 2017 Form NT 10-Q revealed to investors that Global Eagle was unable to file its Quarterly Report on Form 10-Q for the quarter ended June 30, 2017 within the prescribed time period and that **Global Eagle had "identified material weaknesses *in addition to* those previously disclosed that have delayed its finalization of these reports."**

113. Despite lacking internal controls in areas referenced herein, amazingly, Global Eagle announced that it had identified even more weaknesses. This further reiterates the impact the acquisition of EMC had on the internal controls of Global Eagle and the fact that Davis and Severson knew that their statements were false and misleading.

114. On August 15, 2017, Wells Fargo suspended its rating due to the lack of financial reporting stating, "[Wells Fargo] believe that we lack a reasonable basis for our rating and earnings estimates given the lack of reliable financial statements and color on the company's future earnings power." The report also states in pertinent part:

> Global Eagle has not finalized its audited financial statements for the year ended December 31, 2016, and has not filed its 2016 10K. The company requires additional time for the following reasons: (1) its increased size and complexity of its financial reporting following its acquisition of Emerging Markets Communications in July 2016, (2) **the Company's need to transition its finance function after the recent departures of its Chief Executive Officer, Chief Financial Officer and Chief Accounting Officer**, and (3) the Company's need to complete additional financial-closing procedures associated with its material weaknesses in internal control over financial reporting.

> The company has neither finalized its unaudited financial statements nor filed its 10Qs for the quarters ended March 31, 2017 and June 30, 2017. The 10Qs will not be filed until the company has finalized its 2016 10K.

115. On this news, Global Eagle's stock dropped an additional 8.49% from a high of $3.06 on August 14, 2017, to $2.80 at close on August 15, 2017, on unusually heavy volume.

*August 16, 2017 Press Release*

116. On August 16, 2017, Global Eagle filed a Form 8-K with the SEC ("August 16, 2017 Form 8-K") and issued a press release after the market had closed. The August 16, 2017 Form 8-K revealed to investors that Global Eagle received a notification from the Listing Qualifications Department of NASDAQ stating that the Company is in continued non-compliance with NASDAQ Listing Rule 5250(c)(1) because it has not yet filed its Quarterly Report on Form 10-Q for the fiscal quarter ended June 30, 2017 and remains delinquent in filing its Annual Report on Form 10-K for the fiscal year ended December 31, 2016 and its Quarterly Report on Form 10-Q for the fiscal quarter ended March 31, 2017.

117. Global Eagle revealed to investors that NASDAQ has accepted the Company's plan to regain compliance with the NASDAQ Listing Rule and granted Global Eagle ***until September 12, 2017*** to regain compliance. However, Global Eagle would again not be able to meet this deadline.

*September 7, 2017 Press Release*

118. On September 7, 2017, Global Eagle filed a Form 8-K with the SEC ("September 7, 2017 Form 8-K") after the market had closed. The September 7, 2017 Form 8-K announced that Global Eagle would not be meeting NASDAQ's September 12, 2017 deadline or the June 2017 Amendment to the Credit Agreement's September 15, 2017, deadline to filed its 2016 Form 10-K. The September 7, 2017 Form 8-K stated in pertinent part:

> The June 2017 Amendment requires that the Company file its 2016 Form 10-K by September 15, 2017. Although the Company has made substantial progress and continues to commit significant time and resources towards becoming current with respect to all of its annual and quarterly SEC reports, **the Company does not anticipate filing its 2016 Form 10-K before the September 15, 2017 deadline.** As such, the Company is currently in discussions with the Administrative Agent under the Credit Agreement to work with the lender group to seek to obtain a waiver (the "September 2017 Waiver") to extend the deadlines in the June 2017 Amendment to file its 2016 Form 10-K and Quarterly Reports on Form 10-Q for the quarters ended March 31, 2017 and June 30, 2017 (the "Q1 2017 Form 10-Q" and "Q2 2017 Form 10-Q," respectively). The Company and its auditors are strongly committed to filing the 2016 Form 10-K **on or prior to September 30, 2017** and its Q1 2017 Form 10-Q and Q2 2017 Form 10-Q within one month after the 2016 Form 10-K filing.

119. Although NASDAQ required Global Eagle to file its 2016 Form 10-K by September 12, 2017, Global Eagle does not even mention the NASDAQ deadline in its Form 8-K. Instead, despite being over 6 months late, Global Eagle again states that it will not be able to file the 2016 Form 10-K. The delay occurring in September 2017, is directly related to the acquisition of EMC over a year prior in July 2016.

120. On this news, Global Eagle stock dropped from a high of $3.09 at close on September 7, 2017, to a low of $2.80 on September 8, 2017, a 9.3% decline on unusually heavy volume.

**E. Defendants Acted with Scienter**

121. The materially false and misleading misrepresentations and omissions alleged herein were made by the Defendants with scienter.

*Defendants Davis and Severson were Deliberately Reckless*

122. Defendants were deliberately reckless in issuing the statements as demonstrated by their access to info (inferred from repeated willingness to discuss the merger synergies) combined with the lack of controls sufficient to support the statements (as shown by subsequent NT filings and complete turnover of accounting staff).

123. Davis was central to Global Eagle's acquisition strategy and closely monitored the acquisition of EMC. Davis and Severson repeatedly made statements about the integration of EMC and its expected synergies. Davis, Severson, or a representative talked about the synergies of the EMC acquisition in July 2016, August 2016, September 2016[1], October 2016, and November 2016. The Company approved the statements made by the VP.

124. Davis and Severson spoke about the acquisition of EMC routinely and relied on the financials that they knew were deficient in issuing estimates. According to the confidential witnesses, the internal controls of Global Eagle were in disarray from the moment they arrived. According to CW1, the synergies and projected future guidance due to the EMC acquisition were purely based on EMC's existing contracts and projecting those contracts forward and not on any independent basis.

125. Further, CW1 stated that there was an internal concern regarding the acquisition of EMC, the lack of staff available to deal with the acquisition, and the integration of financial systems. According to CW1, there was a lack of full comprehension regarding how to integrate and streamline EMC. CW1 revealed that there was not a full compliance team when it came to the acquisition of EMC and that "a lot of things were done haphazardly and at the last minute." Accordingly, Davis knew he didn't have a basis for what he was saying and knew his statements were false or based on pure speculation. Davis made these statements with a reckless disregard as to whether he was misleading investors.

126. At the very least, as of October 10, 2016, Davis and Severson knew that their statements were false or were deliberately reckless. On October 10, 2016, Global Eagle revealed to investors that Global Eagle had material weaknesses in the quality of

---

[1] On September 8, 2016, Global Eagle SVP of Corporate Development and IR, Kevin Trosian made statements about the synergies of the EMC acquisition at the Gabelli Aerospace & Satellite Connectivity Conference.

information used in its financial controls and as a result, may not be able to produce reliable or accurate financial statements. Global Eagle also stated that it "failed to execute certain control and monitoring activities timely, and at a sufficient level of precision to address the risk of material misstatement to our financial statements." Global Eagle went further and disclosed that due to the focus on the EMC transaction and lack of personnel, Global Eagle had material weaknesses in internal controls related to the "completeness and accuracy of underlying data used in the performance of controls over accounting transactions and disclosures" and "effective monitoring of our controls." Accordingly, despite knowing that their accounting and financials could contain a material misstatement as of October 11, 2016, Defendants continued to issue guidance, and tout the success of the EMC acquisition.

127. Although Davis and Severson knew that they may have material misstatements to Global Eagle's financial statements, Davis and Severson still issued guidance. Had Defendants not given guidance, they would have suffered heavy criticism from analyst and their stock price would have further plummeted.

128. Davis and Severson also had access to information due to their positions in Global Eagle and their involvement of the EMC acquisition. Both Davis and Severson were involved with the acquisition of EMC (Severson as an employee of EMC at the time) and knew that the internal controls were inadequate from the moment the Company acquired EMC. According to CW2 who was directly involved in the integration of EMC, the integration was going poorly. According to both confidential witnesses, Defendants knew the internal controls were weak as evidence by the fact Zemetra told Davis prior to his departure. Further, Global Eagle's internal controls, specifically the accounting, was off from the moment both confidential witnesses were hired. Accordingly, Davis knew that the EMC acquisition had an increased adverse effect on the internal controls.

129. Additionally, although Global Eagle was in the business of acquiring companies, Global Eagle lacked the required number of personnel to account for those

acquisitions. According to CW1, despite knowing that they had inadequate personnel, Global Eagle actually dismissed additional employees rather than hiring more people.

130. Prior to the Class Period, the Company had already experienced on-going material weaknesses. For example, in the Company's Annual Report filed with the SEC on March 17, 2015, Global Eagle indicated that "[d]uring 2014, [Global Eagle] did not implement and maintain effective ITGCs across certain subsidiaries we acquired in 2013." As a result, there was a material weakness in the Company's internal controls.

131. Global Eagle had a history of encountering problems and material weaknesses in its internal controls from acquiring smaller businesses. Despite knowing that the acquisition of smaller companies caused internal controls, and that the EMC acquisition was the largest in history, Davis still issued false guidance based on the acquisition of EMC and stated that it was "on track" to meet those estimates. Davis made these statements without doing the appropriate forecasts. Thus, it is highly indicative that Davis knew the misstatements were false or misleading when they were made.

132. Davis and Severson also repeatedly represented to investors that the Company's internal controls were adequate and that Defendants were complying with their obligations under SOX. Davis and Severson made these representations notwithstanding the fact that the internal controls had been problematic from the very beginning and an acquisition the size of EMC would worsen the internal controls.

133. For example, Defendants represented that they had "Evaluated the effectiveness of the registrant's disclosure controls." Accordingly, Defendants regularly reviewed the internal controls of Global Eagle and knew that they were worsened by the acquisition of EMC.

134. In addition, the core function of the CEO and CFO is to monitor and ensure adequate internal controls of the Company. For example, the Company stated that Davis was qualified to serve on its Board of Directors due to his understanding of the Company, and his operating, investment and management experience. Further, Davis was the prior

CFO of Global Eagle from January 31, 2013 until July 8, 2014. Davis also holds an MBA from the University of Minnesota.

*Defendants Benefitted Financially*

135. As indicated above, Defendants attempted to benefit financially as a result of the lack of internal controls. The compensation committee of Global Eagle's board of directors uses Adjusted EBITDA as one of the primary measures to establish the funding targets for the Company's annual bonus pool for its employees and executives.

136. For 2015, the annual incentive payouts for the named executive officers were calculated as follows: 45% on achievement of pre-bonus Adjusted EBITDA targets, 25% on achievement of consolidated revenue targets, 15% on achievement of 2015 strategic objectives agreed to in December 2014 and 15% on achievement of individual objectives identified for each named executive officer, as assessed by the Compensation Committee. Accordingly, the vast majority of the Defendants' Annual Cash Incentive Compensation came directly from Adjusted EBITDA.

137. As indicated in the May 31, 2017 Form 8-K, the updated fourth-quarter 2016 Adjusted EBITDA guidance was lower than Global Eagle's prior guidance **due in significant part to accounting policy adjustments.** By encouraging an environment of inadequate internal controls, the Defendants were able to inflate Adjusted EBITDA and gain financially. It wasn't until after the departure of the executive Defendants and the true nature of internal controls were revealed that Global Eagle decided to change its accounting policy.

138. Additionally, Severson was highly motivated to cooperate with Davis despite knowing about the fraud. Severson stood to gain financially so long as he did what Davis told him to and continued working until January 27, 2017. This is because Severson and EMC entered into a Special Change of Control Bonus Plan dated as of June 13, 2016 (the "EMC Change of Control Bonus Agreement"), pursuant to which Mr. Severson will receive, subject to his continuous employment with EMC or its successor through January

27, 2017, a transaction bonus of $750,000 (the "EMC Bonus") for his efforts in connection with the Company's successful acquisition of EMC. Accordingly, Severson was financially motivated to stay silent and receive his EMC bonus plus an additional $350,000 in salary from Global Eagle.

139. Global Eagle also has incentives to artificially raise its stock price. As part of the purchase price for EMC, Global Eagle is obligated to pay to the sellers of EMC an aggregate of $25.0 million of deferred consideration in the form of cash or shares of Global Eagle common stock, at Global Eagles' election. Accordingly, the higher Global Eagle can inflate its stock price, the fewer shares it has to ultimately give EMC to fulfill its deferred compensation obligation.

140. Consequently, these allegations both separately and collectively are highly indicative of scienter.

*The Suspicious Timing of the Executives' Abrupt Departures from the Company*

141. On February 21, 2017, *before the market opened*, Global Eagle announced the departure of Davis and Severson, effective February 20, 2017. Global Eagle did not even have a chance to find a replacement for Severson prior to the announcement. Further, and especially suspicious, these departures came at the exact time as Global Eagle announced that it would be delayed in its 2016 Form 10-K filing, and at the same time as telling investors that Global Eagle's previously issued estimates were unreliable.

142. These departures were so suspicious that it prompted multiple reports from analysts. For example, on February 21, 2017 Northland Securities reported the following about the resignations: "While Mr. Leddy's [new CEO] enthusiasm and resume are surely notable, the elephant in the room with this announcement and on our call with Mr. Leddy, was 'Why now? and Why so abrupt? and Didn't the CFO just sign on 5 months ago?'. These questions still linger and are huge body blows to ENT's already bruised credibility."

143. Wells Fargo also issued a report stating, "[i]t is unclear to us why these significant changes are being made right now, but we believe this is a negative for the

stock. The company has been in the middle of a major transformation with the recent acquisition of EMC and multipart investment from Chinese partner Beijing Shareco. Dave Davis was the architect of the current Global Eagle so his departure is concerning. Also concerning, Severson was only appointed to the CFO position in August."

144. The departures of former CEO Zemetra, Senior Vice President & Chief Accounting Officer Frank Mullen, and former CEO of EMC and President & Chief Strategy Officer of Global Eagle Abel Avellan were also highly suspicious and indicative of scienter.

145. Former CEO Zemetra resigned from Global Eagle on August 22, 2016, just one month after the first misrepresentation. According to CW1 and CW2, Zemetra did not resign in order to pursue other opportunities. Zemetra resigned after an argument with CEO Davis regarding the EMC acquisition and lack of internal controls. Although the Company indicated that Zemetra resigned to pursue other opportunities, there is no reference to what those opportunities were. This shows that Zemetra's removal from executive management was neither innocent nor the byproduct of a mutual decision. Rather, Zemetra, after arguing with Davis about the misrepresentations, was pushed out due to his refusal to cooperate with Davis. Eventually, Davis replaced Zemetra by the EMC CFO, Tom Severson.

146. Further, Davis, Severson, Mullens, and Avellan's departures were all within just two months of each other and in close proximity to the corrective disclosures. Only after Davis left did Global Eagle finally reveal the entire extent of its weaknesses in internal controls. During Davis' tenure through the Class Period, Global Eagle disclosed additional material weaknesses twice (it would have been more but for his departure). After Davis left, Global Eagle made one additional correction to the internal controls finally revealing weaknesses in the areas of revenues, license-fee expenses, inventory, internally developed software, goodwill impairment and accounting for business combinations, as well as at the entity level affecting two COSO components relating to control environment and risk

assessment. Accordingly, the timing of the resignations relative to the Company's corrective disclosures on March 16, 2017 creates an inference that their removal was neither innocent nor the byproduct of a mutual decision. Rather, the timing supports an inference that they were pushed out of office due to their materially false and/or misleading statements concerning the Company's internal controls and guidance.

*Defendants Continue to Hide Their Fraudulent Conduct*

147. Global Eagle has not filed a quarterly or annual report (Form 10-Q or Form 10-K) since November 2016. Despite having represented previously that its annual report was to be filed on or before June 30, 2017, the Company most recently stated that it does not intend to make the disclosure until the third quarter of 2017.

148. Global Eagle has also failed to file its annual shareholder report (proxy statement), which discloses executive compensation, among other items.

149. Global Eagle's refusal to file these disclosure reports is intentional. By withholding as much information as possible, Defendants are continuing their efforts to conceal their fraudulent conduct from investors. Defendants' conduct in this regard furthers the inference of scienter alleged above.

*Corporate Scienter*

150. Global Eagle's public statements about success of the EMC acquisition, the synergy and earnings guidance, and the lack of internal controls were critical to the Company's reputation and overall operations. Given the allegations of falsity contained herein, a strong inference exists that Global Eagle's corporate officials knew of the falsity of the statements at the time of publication. Specifically, the knowledge of Global Eagle's former Chief Executive Officer and Chief Financial Officer, Davis and Severson is imputed to Global Eagle. Global Eagle acted with scienter under the corporate scienter doctrine.

**F. Loss Causation and Economic Loss**

151. During the Class Period, as detailed herein, Global Eagle and the Defendants made materially false and misleading statements and engaged in a scheme to deceive the

market and a course of conduct that artificially inflated the price of Global Eagle's common stock and operated as a fraud or deceit on the Class by materially misleading the investing public. Later, when Global Eagle and Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Global Eagle's common stock materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of Global Eagle's common stock during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

152. Global Eagle's stock price fell in response to partial corrective disclosures. These corrective disclosures, and the declines they caused in Global Eagle's stock price, were as follows:

(a) October 11, 2016 – On October 11, 2016, after the market closed, Global Eagle filed a Form S-3 Registration Statement with the SEC ("Registration Statement"). The Registration Statement stated that Global Eagle's acquisition of EMC combined with the lack of sufficient qualified resources prevented the Company from "execut[ing] certain control and monitoring activities timely, and at a sufficient level of precision to address the risk of material misstatement to our financial statements." Moreover, "[Global Eagle] did not appropriately test the completeness and accuracy of information used in the performance of these control and monitoring activities." The disclosures within the Registration Statement raised the possibility that Defendants' earlier statements about Global Eagle's acquisition of EMC and the status of the Company's internal controls were materially misleading. In response to the revelations contained within the Registration Statement, Global Eagle's stock price declined from $9.21 per share at close on October 11, 2016, to $8.85 per share at

close on October 12, 2016, a decline of almost 4% over just one trading day on unusually heavy volume.

(b) November 8, 2016 – On November 8, 2016, Global Eagle issued a press release and conducted an investor conference call to discuss the Company's earnings for the quarter ended September 30, 2016. In the press release and during the conference call, Global Eagle revealed that its efforts to integrate EMC had progressed slower than anticipated and that the integration was proving to be challenging. Global Eagle also announced that it was lowering its expected revenue for the year and that its decision to do so was in part because of the integration problems it was facing with EMC. Analysts paid close attention to the disclosures. On November 9, 2016, Lake Street issued an analyst report stating, "[a]lthough clearly a disappointing start to the combination with EMC completed on August 1st, most investors will be focused on the announcement of a major JV agreement with Shareco . . . ." Lake Street further stated, "Company Stumbles Out of the Gate with EMC Acquisition." In response to Global Eagle's disclosures concerning the integration process with EMC, Global Eagle's stock price declined from $8.19 per share on November 8, 2016, to $7.17 per share on November 9, 2016, a decline of approximately 12%.

(c) February 21, 2017 – On February 21, 2017, Global Eagle issued a press release announcing the sudden departure of Defendant Davis as CEO and Defendant Severson as CFO, both "resigning" effective February 20, 2017. Additionally, the Company also disclosed that it would be late in filing its annual report (Form 10-K) for the fiscal quarter and year-ended December 31, 2016, as well as disclosing that investors

should no longer rely on any previous estimates Global Eagle had made. The press release noted that Global Eagle needed additional time to complete its annual report given its "increased size and complexity" following the EMC acquisition. These disclosures further demonstrated to investors that Global Eagle's past statements about EMC and the Company's internal controls had not been entirely accurate. As a result of the revelations, Global Eagle stock price declined from $6.22 per share on February 17, 2017, to $4.48 per share on February 21, 2017 (the following trading day), a decline of almost 28%.

(d) March 13, 2017 – On March 13, 2017, after trading hours, Global Eagle issued a press release announcing the resignation of Frank Mullen, Senior Vice President & Chief Accounting Officer of Global Eagle, with his last day of employment expected to be April 14, 2017. The departure of yet another senior executive further signaled to the market that Global Eagle's internal controls over financial reporting had been severely deficient and that the Company's difficulty over integrating EMC had been worse than what had previously been stated by the Company. On this news Global Eagle's stock price dropped from $4.42 per share on March 14, 2017 at market open, to close at $4.19, a change of over 5%.

(e) March 16, 2017 – On March 16, 2017, after the market closed, Global Eagle filed a Form NT 10-K ("Form NT 10-K") announcing the Company's inability to file its annual report on Form 10-K for the fiscal year ended December 31, 2016 within the prescribed time period. The Company also disclosed for the first time "additional material weaknesses in internal control," including "additional

material weaknesses in internal control over financial reporting in the areas of revenues, license-fee expenses, inventory, internally developed software, goodwill impairment and accounting for business combinations, as well as at the entity level affecting two COSO components relating to control environment and risk assessment." These statements, among others, revealed to investors that Global Eagle's internal control deficiencies were widespread and severely impacting the Company's ability to accurately report its financial earnings. This revealed to investors the true state of the dire state of internal controls at Global Eagle and despite Global Eagle's assurance of the integration of EMC, the Company completely lacked the internal controls to adequate acquire a company the size of EMC without severe repercussions to investors and Global Eagle. On this news, Global Eagle's stock price declined from $4.09 per share on March 16, 2017, to $3.50 per share on March 17, 2017, a 14.42% decline.

153. Defendants concealed from investors during the Class Period that the Company had a severe and deficient lack of internal controls as well as the fact that Defendants had used the acquisition of EMC as a means for their own personal gain. Each of the partial corrective disclosures identified above revealed to investors in part that the Company's internal controls were insufficient in some respect. In other words, the partial corrective disclosures addressed the fraud in which Defendants had engaged during the Class Period.

154. Analyst reports corroborate Plaintiffs' loss causation allegations in this regard. For example, on February 21, 2017, Piper Jaffray downgraded Global Eagle in response to the Company's revelations concerning the "abrupt departure" of the Company's CEO and CFO as well as the disclosures concerning the Company's "internal control issues." Specifically, Piper Jaffray stated that: "Unexpected CEO/CFO departure

signals red flags in reporting. In addition to the departure of both the CEO and CFO, the company announced the delay of its 10-K filing for a number of reasons with 'material weaknesses in internal control over its financial reporting' being one of them." Piper Jaffray's analysis shows that the CEO's and CFO's departures as well as the Company's internal control disclosures revealed to the market that the Company's internal accounting was not as it was represented, and that the Company's statements otherwise were likely false.

155. Northland Securities reported likewise on February 21, 2017. In its analyst report, the firm stated that:

> While Mr. Leddy's [new CEO] enthusiasm and resume are surely notable, the elephant in the room with this announcement and on our call with Mr. Leddy, was "Why now? and Why so abrupt? and Didn't the CFO just sign on 5 months ago?". These questions still linger and are huge body blows to ENT's already bruised credibility.
>
> While we don't have concrete answers and can only conjuncture, we simply believe that ENT's is well over their ski's on adeptly integrating their numerous acquisitions that they've purchased over the past 18 months and Board Chair Ed Shapiro and the Board's patience for tangible signs of successful execution hit a breaking point. More specifically, we believe there are still lingering issues relating to their largest and far reaching EMC acquisition, as we continue to have more question marks than answers on the potential TAM opportunity, baseline economics and or synergies with ENT's current connectivity and content business segments. We now expect ENT to report their Q4:16 quarter no sooner than March 15th or about 2 weeks later than originally planned as filing their audit and 10K will take precedence."

156. The statements from these analysts, as well as others, show that Global Eagle's partial corrective disclosures revealed material information to investors about Defendants' fraud. As such, they constitute partial corrective disclosures for the purposes of establishing loss causation.

**G. Presumption of Reliance; Fraud-On-The-Market**

157. At all relevant times, the market for Global Eagle's common stock was an efficient market for the following reasons, among others:

(a) Global Eagle's common stock met the requirements for listing and was listed and actively traded on the NASDAQ during the Class Period, a highly efficient and automated market;

(b) Global Eagle communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c) Global Eagle was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d) Unexpected material news about Global Eagle was reflected in and incorporated into the Company's stock price during the Class Period.

158. As a result of the foregoing, the market for Global Eagle's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in Global Eagle's stock price. Under these circumstances, all purchasers of Global Eagle's common stock during the Class Period suffered similar injury through their purchase of Global Eagle's common stock at artificially inflated prices, and a presumption of reliance applies.

159. Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the

facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

**H. No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine**

160. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint.

161. To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

162. Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Global Eagle who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by the defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

163. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Global Eagle's common stock during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from

the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

164. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Global Eagle's common stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Global Eagle or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of November 4, 2016, the date of the Company's last quarterly or annual report within the Class Period, there were 85,309,744 shares of the Company's common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

165. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

166. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

167. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Global Eagle;

(c) whether the Individual Defendants caused Global Eagle to issue false and misleading financial statements during the Class Period;

(d) whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e) whether the prices of Global Eagle's common stock during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

(f) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

168. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action

**COUNT I**
**Against All Defendants**
**for Violations of Section 10(b) and Rule 10b-5 Promulgated Thereunder**

169. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

170. This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

171. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Global Eagle common stock; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Global Eagle's common stock and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

172. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Global Eagle's common stock. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

173. By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially

false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

174. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of Global Eagle's internal affairs.

175. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Global Eagle's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Global Eagle's common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Global Eagle's common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

176. During the Class Period, Global Eagle's common stock was traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Global Eagle's common stock at prices artificially inflated

by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Global Eagle's common stock was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Global Eagle's common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

177. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

178. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

**COUNT II**
**Against the Individual Defendants**
**for Violations of Section 20(a) of the Exchange Act**

179. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

180. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about Global Eagle's misstatements.

181. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by Global Eagle that had become materially false or misleading.

182. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings that Global Eagle disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Global Eagle to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Global Eagle's common stock.

183. Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Global Eagle to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities that comprise the primary violations about which Plaintiff and the other members of the Class complain.

184. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated: September 11, 2017

/s/ Adam C. McCall

**LEVI & KORSINSKY LLP**
Adam C. McCall (SBN 302130)
445 South Figueroa Street, 31st Floor
Los Angeles, CA 90071
Tel: (213) 985-7290
Fax: (202) 333-2121
Email: amccall@zlk.com

-and-

**LEVI & KORSINSKY LLP**
Nicholas I. Porritt (*pro hac vice to be submitted*)
Adam M. Apton *(admitted pro hac vice)*
1101 30th Street NW, Suite 115
Washington, DC 20007
Tel: (202) 524-4290
Fax: (202) 333-2121
Email: nporritt@zlk.com

Email: aapton@zlk.com
*pro hac vice to be submitted*

BRONSTEIN, GEWIRTZ & GROSSMAN
Shimon Yiftach (SBN 277387)
1925 Century Park East, Suite 1990
Los Angeles, CA 90067
Tel: 424/322-0322
Fax: 212/697-7296
Email: shimony@bgandg.com

-and-

BRONSTEIN, GEWIRTZ & GROSSMAN
Peretz Bronstein, Esq. *(pro hac vice to be submitted)*
60 East 42nd Street, Suite 4600
New York, New York 10165
212.697.6484
peretz@bgandg.com

***Attorneys for Lead Plaintiff M & M Hart Living Trust, Randi Williams, and Co-Lead Counsel for the Class***

# CERTIFICATE OF SERVICE

I hereby certify that on September 11, 2017, I electronically filed the document(s) with the Clerk of the Court by using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing ("NEF") was automatically generated to the CM/ECF registrants on record. Participants in the case who are not registered CM/ECF users will be served by mail or by other means permitted by the court rules.

Dated: September 11, 2017

s/ Adam C. McCall
Adam C. McCall